STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. BROOKE MURPHY, A/K/A ROBERT S. GREEN, A/K/A BOB GREEN, DEFENDANT-APPELLANT.

Argued October 14, 1987—Decided March 28, 1988.

*Michael Critchley* argued the cause for appellant (*Critchley & Roche*, and *Alan L. Zegas*, attorneys; *Michael Critchley* and *Alan L. Zegas* on the brief).

*Catherine A. Foddai*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This case primarily concerns the proper procedures to be followed by courts and by prosecutors in screening grand jurors for possible prejudice. We shall also address the consequences of the State's failure to adhere to those procedures in the case before us. We find that although the proper procedures were not followed here, their absence neither tainted the indictment nor deprived the defendant of fundamental fairness during the grand jury proceedings. Consequently, we affirm the conviction of the defendant for conspiracy and for theft by deception. In the exercise of our supervisory jurisdiction over criminal procedure, however, we shall require that any future deviation from the procedures outlined in this opinion will lead to the dismissal of any resulting indictment.

I

For purposes of this appeal, we shall accept defendant's statement of the facts and proceedings below. Because the legal issues turn on the facts of this case, we shall state them in detail.

Defendant, Brooke Murphy, and others were indicted for participating in a conspiracy to defraud various insurance companies through the submission of false documents. Murphy was also charged with individual acts of theft by deception. Prior to trial, Murphy moved to dismiss the indictment alleging

that prosecutorial abuses had influenced the State grand jury that had indicted him.

The particular State grand jury was convened after having been sworn and charged by the Mercer County Assignment Judge to hear the evidence developed in a State insurance fraud investigation. Although this State grand jury was not specifically convened to investigate this statewide insurance scam, so far as we can discern from the record this was its sole task. The grand jury sat in Trenton at the Hughes Justice Complex. The Mercer County Assignment Judge's chambers are located several blocks away in the Mercer County Courthouse.

Before presenting evidence to the Grand Jury, a Deputy Attorney General [hereinafter, "DAG 1"] identified for the grand jurors both the alleged perpetrators and the insurance companies that were victims of the purported fraud. After the State had identified the parties involved, one of the grand jurors disclosed that she was currently employed by the Allstate Insurance Company, one of the alleged victims. On questioning by DAG 1, the grand juror said that she would not be prejudiced if she continued to sit on the grand jury. Although the assignment judge supervising the grand jury was sitting and available in the Mercer County Courthouse, DAG 1 was directed by his superior, DAG 2, not to inform the judge of the potential conflict of interest and possible bias of the Allstate grand juror.

The Allstate juror was sitting with the other members of the grand jury on April 21, 1983, when the first witness to appear, an employee of the Allstate Insurance Company, testified for the State. After having heard the testimony of the Allstate witness, the Allstate juror telephoned DAG 2 on April 27, 1983, disclosed that she was currently involved in litigation with Allstate, and said that she no longer wished to sit as a grand juror. This conversation occurred one day before the next scheduled session of the grand jury. DAG 2 did not disclose to the assignment judge his conversation with the Allstate juror.

Instead, on his own initiative, he excused the Allstate grand juror from sitting on the grand jury. DAG 2's actions were summarized in court by DAG 1:

> [DAG 2] excused that juror, not from the Grand jury service, but from sitting on this particular case which is, as I understand it, the proper method or the method that is followed with the State Grand jury, apparently with the Assignment Judge's acquiescence, I would have to assume, since this has occurred on more than one occasion in the course of Grand Jury proceedings.

DAG 2 acknowledged that the Allstate juror had spoken with the other grand jurors on April 21, 1983, and stated that he believed that the conversation "may have had to do with information about Allstate." In defendant's view, DAG 2 "misinformed" the grand jury's foreman about why the Allstate juror would no longer be sitting by stating that the Allstate juror had "excused herself from any further participation."

The grand jury reconvened on April 28, 1983. Just prior to the luncheon recess, one of the grand jurors informed DAG 1 that he was "concerned" because he was currently employed by the State Farm Insurance Company, another alleged victim of the fraud under investigation. As in the case of the Allstate grand juror, the assignment judge was sitting and available but was not informed of the State Farm juror's potential bias. Instead, shortly before the afternoon session of the grand jury, the DAGs instructed the foreman to speak off the record with the State Farm juror in order to investigate his potential bias. In particular, the foreman was instructed to inquire whether the State Farm juror was, through his employment, privy to information or facts that related to the pending investigation. The DAGs advised the foreman that if the juror's "answer is no, then it's really up to that juror whether or not he wants to sit." The foreman was also instructed that if the juror answered "no," the foreman should ask the juror whether he could render a judgment based solely on the evidence presented before the grand jury.

The foreman apparently conducted the inquiry in the presence of the other jurors. He then reported back to the DAGs:

"I asked him would you care to stay on. He was a little reluctant to say yes or no. He [said], 'I'll tell you right now I'll be a little prejudice[d].'" The foreman then told the DAGs that the grand jurors had taken a vote among themselves to determine whether to retain the State Farm juror:

> I asked the rest of the Jurors what did they feel about it. There are some people that think that even though he may be prejudice [sic] to the case, he's one against many and in some particular cases he may be able to help the rest of the Jurors as far as information is concerned. So, we have voted to keep him on.

Again, neither DAG furnished this information to the assignment judge, who was sitting and available. When the April 28, 1983, afternoon session of the grand jury was concluded, the prosecutors held a conference with the foreman and the State Farm juror. The juror stated: "I just wanted to make it known that I work for an insurance company and my opinions, because of that, may not be purely as objective as someone else's not having that background." DAG 2 responded: "There is nothing improper with your bringing to bear on your opinion all the collective experience that you have and whether that's a particularized experience as a result of your employment or any other knowledge, there's nothing wrong with that." Thereafter, the juror stated: "I think I could be * * * objective." The State Farm juror remained on the grand jury.

After the indictment was returned, it was assigned to Union County for trial. Defendant moved before the Union County Assignment Judge to dismiss the indictment on the basis of the above facts. That court found that because the Allstate juror had been removed from the grand jury before any substantial evidence had been presented, the presence of that juror "did not in any way infect the proceedings." Although the court found that the situation with respect to the State Farm juror was "quite different," it nevertheless concluded that the State Farm juror's lack of knowledge about the subject matter of the investigation "undermines largely any allegation of prejudice." The court also found that although the State Farm juror had used the word "prejudice" to describe his bias, the term was

not intended to convey the same meaning that lawyers and judges "would attach to its use in the courtroom."

Following the denial of defendant's motion to dismiss the indictment, the trial began. It was a twenty-eight day trial. Defendant was found guilty of conspiracy and of seven counts of theft by deception. He was sentenced to a term of seven years, with a parole disqualifier of two years and four months. He was also fined $100,000.00 and was assessed a $25.00 violent crime penalty. The trial court merged all the counts charging theft by deception into the conspiracy count.

On appeal, the Appellate Division ruled that the prosecutors had acted improperly by unilaterally making decisions about whether the Allstate and State Farm jurors should have been excused: The court stated:

> We hold that where a prosecutor obtains information which supports a legitimate and colorable basis for believing that a grand juror lacks impartiality, he may not unilaterally decide to allow that juror to remain on the panel. [*State v. Murphy*, 213 *N.J.Super.* 404, 409 (App.Div.1986).]

Although agreeing with defendant that the prosecutors were "duty-bound to apprise the assignment judge so that appropriate hearings [could] be conducted and the facts fully developed," the court nevertheless ruled that because Murphy had not demonstrated prejudice, there was no "justifiable basis for vitiating [his] conviction." *Ibid.*

Defendant subsequently filed a motion seeking reconsideration of the Appellate Division's decision because the opinion addressed only the issue of prosecutorial misconduct before the grand jury and did not consider defendant's other arguments, namely, that the prosecutors had violated this State's comprehensive statutory scheme for grand jury selection; that the "separation of powers" clause of the New Jersey Constitution had been violated; and that defendant's right to indictment by an unbiased grand jury had been violated.

Following the Appellate Division's denial of reconsideration, we granted certification to review that court's judgment. 107 *N.J.* 120 (1987).

## II

■ At the outset, we will address the State's arguments that no matter how biased the grand jurors who return an indictment, defendant cannot complain here because he has received a fair trial by an impartial jury and that, in any event, grand juror bias is not grounds to question an indictment. The first argument would extend *United States v. Mechanik,* 475 *U.S.* 66, 106 *S.Ct.* 938, 89 *L.Ed.*2d 50 (1986), to hold that any irregularity occurring during the charging process is irreversible after a fair trial. But even on the federal side courts have held that the contrary is true. *Mechanik,* which held that the procedural irregularity of two witnesses testifying in tandem before a grand jury did not taint the subsequent trial, "was carefully crafted along very narrow lines," and because the case involved a violation of the "technical variety," it raised no issues of "fundamental fairness." *United States v. Taylor,* 798 *F.*2d 1337, 1340 (10th Cir.1986); *see also United States v. Larouche Campaign,* 829 *F.*2d 250, 253 (1st Cir.1987) (government attempts to undermine impartiality of grand jury are reviewable after trial).

■ As to the State's second argument, there is indeed respectable authority for the proposition "that a grand juror's prior opinion as to the guilt of the accused or his interest in the prosecution does not serve to disqualify him from service." *State v. Haberski,* 449 *A.*2d 373, 380 (Me.1982), *cert. denied,* 459 *U.S.* 1174, 103 *S.Ct.* 823, 74 *L.Ed.*2d 1019 (1983); *see also Rippy v. Tennessee,* 550 *S.W.*2d 636, 642 (Tenn.1977) (grand jury, as an accusatory body and not a judicial body, "has right and obligation to act on its own information however acquired" (citation omitted)). We suspect that this principle is rooted more in history than in justice. Its theory is that "since grand jurors live in the vicinity of the place where the crime was committed, it may be assumed in many instances that they know better than others the character of the parties and of the witnesses." *State v. Haberski, supra,* 449 *A.*2d at 380–81

(citation omitted). That supposition, like its counterpart in the petit jury context, has lost its meaning in contemporary society, where citizens hardly know the neighbors beyond their block, much less all the affairs of the community. Now we seek to impanel juries that do not know the facts of a case. *Sheppard v. Maxwell,* 384 *U.S.* 333, 86 *S.Ct.* 1507, 16 *L.Ed.*2d 600 (1966).

We believe that the guarantee of an indictment by grand jury, enshrined in our State and federal constitutions, now means more than indictment by a body that may have pre-judged the case. Some confusion has persisted on this score because the federal fifth-amendment right to indictment by a grand jury has not been incorporated through the fourteenth amendment. However, the United States Supreme Court has insisted that under the equal protection clause, selection of both grand and petit jurors must be free from any taint of discrimi-natory purpose. *Strauder v. West Virginia,* 100 *U.S.* (10 *Otto* ) 303, 25 *L.Ed.* 664 (1880). *See generally* Note, 111 *U.Pa.L.Rev.* 1000, 1003 (1968) ("Historically the grand jury has been charged with the twofold responsibility of bringing the guilty to trial while protecting the innocent from unfounded prosecution." (footnote omitted)). Thus, while not explicitly incorporating the right to indictment into the fourteenth amend-ment, the Supreme Court has suggested that "[i]t may be that the Due Process Clause of the Fourteenth Amendment requires [a] State, having once resorted to a grand jury procedure, to furnish an unbiased grand jury." *Beck v. Washington,* 369 *U.S.* 541, 546, 82 *S.Ct.* 955, 958, 8 *L.Ed.*2d 98, 105 (1962) (finding it unnecessary to resolve due process question because it was satisfied that Washington State's procedure sought to guarantee an unbiased grand jury).

In any event, we have interpreted our constitutional guaran-tee of indictment by a grand jury, *N.J. Const.* of 1947 art. I, para. 8, in light of federal precedent. *State v. Ramseur,* 106 *N.J.* 123, 215 n. 42 (1987). Under federal law, "[w]hen a person is brought before the grand jury * * * that individual is consti-tutionally entitled to have his case considered by an impartial

and unbiased grand jury." *United States v. Burke,* 700 *F.*2d 70, 82 (2d Cir.), *cert. denied,* 464 *U.S.* 816, 104 *S.Ct.* 72, 78 *L.Ed.*2d 85 (1983) (citing *Lawn v. United States,* 355 *U.S.* 339, 349–50, 78 *S.Ct.* 311, 317–18, 2 *L.Ed.* 2d 321, 329–30 (1958), and *Costello v. United States,* 350 *U.S.* 359, 363, 76 *S.Ct.* 406, 408–09, 100 *L.Ed.* 397, 402 (1956)).

Yet, we need not rest our conclusion on constitutional premises. We are satisfied that the procedures established in New Jersey by statute and by rule to implement the constitutional right to indictment contemplate indictment by an unbiased grand jury.

### III

Turning from matters of substance to those of procedure, we first address the question of responsibility for insuring the selection and retention of unbiased grand jurors. It is suggested that the grand jurors themselves should be the judges of each other's qualifications. Hence, it is argued that the procedures followed in this case were proper because the grand jury itself judged the qualifications of the State Farm juror. Some believe that courts have no business inquiring into the processes of a grand jury. Learned Hand accorded grand juries an almost mythical stature. In *In re Kittle,* 180 *F.* 946 (C.S.D.N.Y.1910), a case argued by then Assistant United States Attorney Felix Frankfurter, Judge Hand categorized the grand jury as being "what the Grand Assize originally was, and what the petit jury has ceased to be, an irresponsible utterance of the community at large, answerable only to the general body of citizens, from whom they come at random * * *." *Id.* at 947. Faulkner wrote that "the very sound of the two words [Grand Jury] with their evocation secret and irrevocable [suggests] something of a hidden and unsleeping and omnipotent eye watching the doings of men * * *." W. Faulkner, *Light in August* 431–32 (1932). Our Legislature has taken a less promethean view.

As noted, this was a State grand jury. Under the State Grand Jury Act, *N.J.S.A.* 2A:73A–1 to –9, the Supreme Court is authorized to promulgate rules and regulations necessary to govern the procedures of the State grand juries. We have also made our rules governing county grand juries generally applicable to the State grand jury. *R.* 3:6–11(a). In this state, general grand jury selection procedures are governed by *N.J.S.A.* 2A:71–1 to –7. Although pursuant to *Rule* 3:6–11(b), an assignment judge is designated to impanel and supervise the State grand jury, we have not established precise rules governing the method by which assignment judges participate in the selection and evaluation of grand jurors. Under *N.J.S.A.* 2A:78–1 the assignment judge is empowered to excuse a juror "[w]henever it appears that any member * * * should be excused from serving during the designated portion of the stated session for which the panel was drawn and summoned to serve." We agree that this statute appears to contemplate excuse or discharge of a juror from an entire session of grand jury service, rather than a juror's disqualification in a particular matter. *In re Jeck*, 26 *N.J.Super.* 514, 518–19 (App.Div.), *certif. denied*, 13 *N.J.* 429 (1953).

In *State v. Ramseur, supra,* 106 *N.J.* 123, we discussed in general terms the process by which judges examine a panel of grand jurors to obtain qualified grand jurors. *Rule* 3:6–3 states only that when the assignment judge charges the grand jury, the judge should then provide a copy of the charge to each juror. The Attorney General's Grand Jury Manual indicates that the following should be done by the prosecutor:

> It would be advisable to suggest to them that a juror who has personal knowledge of the facts of a case or who is acquainted with a complaining witness, victim or defendant, should call that fact to the attention of the Foreman. The juror should consider disqualifying himself or herself from deliberating and voting in the matter. [*New Jersey Grand Jury Manual* 2 (1983).]

We have been referred to no case law or statute imposing a specific responsibility for inquiring into the potential bias or interest of prospective grand jurors. "At present it is [thought

to be] sufficient that the court instruct grand jurors to decide each case on the merits and 'without fear or favor, prejudice or sympathy, examine the evidence presented * * * in each case and determine whether or not it merits * * * returning an indictment against the accused.'" *State v. Smith,* 102 *N.J.Super.* 325, 343 (Law Div.1968), *aff'd,* 55 *N.J.* 476, *cert. denied,* 400 *U.S.* 949, 91 *S.Ct.* 232, 27 *L.Ed.*2d 256 (1970) (citation omitted). "In addition, grand jurors are required to take an oath pursuant to *N.J.S.A.* 2A:73-3, which provides, in pertinent part, that they will 'present no one through envy, hatred or malice; [nor] leave anyone unpresented for fear, favor or affection, for reward, gain or the hope thereof.'" *State v. Smith, supra,* 102 *N.J.Super.* at 343-44.

Federal procedure with respect to grand juries appears to be more precise. The Federal Jury Selection and Service Act, 28 *U.S.C.A.* §§ 1861 to 1877, sets forth detailed procedures for the selection and impaneling of grand jurors. Because federal courts have the authority to excuse potential grand jurors for cause, they also have the concomitant power to question potential jurors on appropriate subjects in order to measure their ability to serve impartially. This point has been illustrated in the converse situation where courts have interrogated jurors to determine their partiality toward a defendant. *Compare United States v. Hoffa,* 349 *F.*2d 20, 33-34 (6th Cir.1965), *aff'd on other grounds,* 385 *U.S.* 293, 87 *S.Ct.* 408, 17 *L.Ed.*2d 374 (1966) (discussing trial court's examination of potential grand jurors) *with United States v. Gibson,* 480 *F.Supp.* 339, 342-43 (S.D. Ohio 1979) (considering excusal of all union members in inquiry into allegedly criminal union activities). Similarly, in *United States v. Maine Lobster Co.,* 160 *F.Supp.* 122 (D.Me. 1957), the court excused a lobster fisherman from service on a grand jury investigating charges of price fixing in the lobster industry. In that context, the court concluded that because of the lobsterman's occupation and position, "bias or prejudice might well be presumed." *Id.* at 125.

Because of the statutory responsibility assigned to this Court to promulgate rules and regulations governing the procedures of State grand juries, and because of the explicit power of courts to excuse grand jurors for cause, we find that the supervising court has a corresponding implicit power and responsibility to determine the impartiality of grand jurors.

## IV

■ As noted, the court below did not exercise any supervisory authority in this case. In fact, the assignment judge was not involved at any stage in the specific examination of the qualifications of these individual jurors with respect to their ability to serve without bias or prejudice. Rather, the Deputy Attorneys General assigned to the grand jury undertook to resolve these questions on their own. This should never happen again. We believe that a prosecuting attorney has the obligation not only to note the existence of possible prejudice or bias on the part of a grand juror but to disclose such circumstances to the court and to afford the court the opportunity to preserve the impartiality of the grand jury proceedings. Accordingly, we now hold that, as an officer of the court, the prosecuting attorney has a responsibility to bring to the attention of the presiding judge any evidence of partiality or bias that could affect the impartial deliberations of a grand juror. *See State v. Marchitto*, 132 *N.J.Super.* 511, 515–17 (App.Div.), *certif. denied*, 68 *N.J.* 163 (1975) (court has duty to investigate potential juror bias); *see also* RPC 3.3 (attorney's obligation of candor toward tribunal). We hold further that upon such a disclosure the court should determine whether such partiality or bias exists and whether it justifies excusal of the grand juror from the particular case being considered or from the panel.

■ We must determine what consequences flow from the failure in this case to follow such procedures in the administration of the grand jury process. Without disparaging the intentions of the prosecuting authorities involved in this matter, it is

clear that they undertook to resolve for themselves how the question of juror bias should be handled. However, we disagree with the argument in Point I of defendant's brief for reconsideration that the Deputy Attorneys General involved deliberately violated statutes or court Rules. The simple answer is that our court Rules do not specifically address this question. Hence, we also disagree with Points II and III of that brief that the Deputies' encroachment on the court's power was a violation of the "separation of powers clause" of the New Jersey Constitution sufficient to require dismissal of the indictment; or that their actions evidenced intentional misconduct that corrupted the essential integrity of the grand jury which would also require dismissal of the indictment. Rather, we believe that the question that we must resolve is whether the continued presence of the State Farm grand juror, as well as the DAGs' failure to follow what we have now ruled is the correct procedure in the administration of the grand jury process, demonstrate a bias in the charging process that requires dismissal of the indictment and reversal of the judgment of conviction entered thereon.

In *State v. Ramseur, supra,* 106 *N.J.* 123, we had occasion to review the distinction to be made between the effect of improper procedures in the grand and the petit jury processes. In formulating remedies for violations of grand jury selection practices, we held that violations of procedural requirements warrant dismissal of an indictment only when "they substantially undermine the randomness and objectivity of the selection mechanism or cause harm to the defendant." *Id.* at 232 (footnote omitted). We also noted that in the petit jury context harm would be presumed from the absence of proper selection procedures.

We are satisfied that in this case the assignment judge who entertained the motion to dismiss the indictment carefully weighed the evidence concerning the bias or prejudice of the State Farm juror and the possible consequences of the improper

procedures, including any damaging discussions between the remaining grand jurors and the Allstate grand juror. The assignment judge had to resolve whether the somewhat conflicting answers of the State Farm grand juror demonstrated the receipt of information or the possession of attitudes that would conflict with the juror's ability to evaluate fairly the evidence against the defendant. It is a question on which minds may reasonably disagree, but we ordinarily defer to a trial court's fact-finding unless it was based on inadequate evidence, incorrect principles of law, or unless there was a clear mistake in judgment. *See State v. Ramseur, supra,* 106 *N.J.* at 266.

We are satisfied that the court fairly resolved that the presence of the State Farm grand juror did not "substantially undermine" the objectivity of the charging process or cause harm to the defendant. An indictment should be dismissed only on "the clearest and plainest ground." *State v. New Jersey Trade Waste Ass'n,* 96 *N.J.* 8, 18 (1984) (citations omitted). "Unless the prosecutor's misconduct * * * is extreme and clearly infringes upon the [grand] jury's decision-making function, it should not be utilized * * * to dismiss[ ] an indictment." *State v. Schamberg,* 146 *N.J.Super.* 559, 564 (App.Div.), *certif. denied,* 75 *N.J.* 10 (1977). *Schamberg, supra,* cited *State v. Hart,* 139 *N.J.Super.* 565 (App.Div.1976), as an example of extreme prosecutorial interference with the grand jury's decision-making process. In *Hart,* the prosecutor offered his opinion to the grand jury on its failure to indict, thereby causing the grand jury to reconsider bringing an indictment. No such interference is alleged here.

■ However, even in the absence of such prejudice, we would not hesitate to reverse a conviction if we believed that the conduct of the prosecutors in obtaining an indictment amounted to an intentional subversion of the grand jury process. If the record in this case demonstrated conduct of that quality, a reversal of the conviction would be the only appropri-

ate disposition that would vindicate our interest in preserving the impartiality of the grand jury procedure. It does not exaggerate the record to state that the DAGs in this case demonstrated extraordinarily poor judgment in not advising the assignment judge that two of the grand jurors had connections with insurance companies that were allegedly victimized by the defendant; the Law Division found this conduct to be "contrary" to the practice established for county level grand juries. However, the lack of clear direction in the Attorney General's *Grand Jury Manual* and the absence of any directly applicable court Rule combine to convince us that although we strongly disapprove of the prosecutors' conduct in this case, it was not a willful and deliberate violation of established procedures. Hence, we decline to reverse this conviction.

In the future, however, we shall require that violation of such procedures by a prosecuting attorney, in the face of evidence of grand juror bias or partiality, will result in dismissal of an indictment prior to trial. We do this in the exercise of our supervisory responsibility over the administration of criminal justice. The grand jury has always occupied a high place as an instrument of justice in our system of criminal law. To leave to conjecture the question of whether a particular juror might have been possessed of bias or interest in a cause inadequately realizes the high purposes of the guarantee of indictment by grand jury.

As for any other consequence of our ruling, we believe that the best course is to refer the issue of grand juror qualifications to our Criminal Practice Committee. We have used this procedure to assure fullest exploration of the practical ramifications of particular rulings. *State v. Brunson*, 101 *N.J.* 132, 145 (1985) (exercise of peremptory challenges to jurors); *State v. Valencia*, 93 *N.J.* 126, 142 (1983) (issuance of telephone search warrants). We neither intend nor suggest that there shall be sweeping investigations into any and all potential interests on the part of grand jurors in particular matters. We recognize

that in the vast majority of cases that are processed through a county grand jury during a given session it is not possible for an assignment judge to predict in advance what particular factual circumstances may be presented. It may suffice to instruct the grand jurors that they should be sensitive to not participating in cases in which they might have a financial, proprietary, or personal interest and that they should bring any such circumstances to the court's attention. Nor would we countenance post-indictment investigation into the affairs of particular grand jurors on the supposition that they may or may not have had an interest in the outcome of the proceedings. But certainly in the case of a State grand jury that is investigating corruption in a particular industry it may be appropriate to fashion a brief inquiry into the backgrounds of potential grand jurors that will enable the court readily to determine their potential for bias or interest. We leave the specifics of such procedures to the Committee.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.