775 A.2d 227 (2000)
341 N.J. Super. 302
STATE of New Jersey
v.
Andrew R. SIVO, Jr., Dino Spanicciati, Robert E. Mule, Sr., Anthony M. Angelini, Alfonso Napoleon, Leonard F. Recine, James A. Azzinaro, Frank J. Ciliento, Stanley R. Cwiklinski, Dominick Demarco, John Scaccetti, Thomas M. Wolverton, Sr., Elizabeth P. Peroni, Baron A.A., Inc., Defendants.
State of New Jersey
v.
Andrew Sivo, Jr., Frederick A. Crucili, Baron A.A., Inc., Defendants.
Superior Court of New Jersey, Law Division, Mercer County.
Decided April 12, 2000.
*229 Samuel Reale, Jr., Robert B. Leaman, and Christopher D. Matthews, Deputy Attorneys General, for the State of New Jersey.
Robert DeGeorge, Trenton, for defendant, Andrew R. Sivo, Jr.
Rudolph A. Palombi, Trenton, for defendant, Dino Spanicciati.
Lindsey L. Burbage, for defendant, Robert E. Mule, Sr.
Ralph J. Kelly, Cherry Hill, for defendant, Anthony M. Angelini.
Robert Obler, Princeton, for defendant, Alfonso Napoleon.
George R. Sapanaro, for defendant, Leonard F. Recine.
Craig T. Hubert, for defendant, James A. Azzinaro.
*230 James R. Wronko, Somerville, for Frank J. Ciliento.
Christopher Warren, for defendant, Stanley R. Cwiklinski.
Peter N. Gilbreth, Morristown, for defendant, Dominick DeMarco.
Angelo S. Ferrante, Trenton, for defendant, John Scaccetti.
Edward A. Hoffman, Trenton, for defendant, Thomas M. Wolverton, Sr.
Joseph W. Eustace, Lawrenceville, for defendant, Elizabeth P. Peroni.
Kevin M. Hart, Lawrenceville, for defendant, Baron A.A., Inc.
John M. Holliday, Trenton, for defendant, Frederick A. Crucili.
*228 DELEHEY, J.S.C.
The Baron A.A. ( Athletic Association), Inc., and 14 of its members are charged in two separate indictments with conspiracy, racketeering, violations of gambling laws, wetland laws, and other crimes. The "gambling" indictment charges repeated acts of promoting gambling, maintaining a gambling resort, unlawful sale of "Baron" lottery tickets, misconduct by corporate officials, and the unlawful sale of alcoholic beverages. The "wetlands" indictment charges three of the defendants with building on environmentally protected lands. The defendants now move for dismissal of the indictments alleging prosecutorial misconduct and selective prosecution.
Dubbed an athletic association, there is no evidence that any of the Baron's more than 400 members engaged in activities of olympic proportion  the javelin toss, the hammer throw or the pole vault. Instead, they pursued other activities  the operation of slot machines and the maintenance of a lottery. It is the latter, less strenuous activities, and the Baron's failure to procure a liquor license, that precipitated a State Police investigation and the present indictments.
More specifically, the State alleges that between 1984 and 1997 the Baron, located in Hamilton Township, Mercer County, operated a lottery with income of $4.5 million. The lottery, "conducted for the benefit of the Baron A.A., its officers, executive board and general membership," was designed to coincide with the New Jersey State Lottery's Wednesday and Friday Pick-4 drawings. Also, between 1986 and 1998 video poker machines (Joker Poker) and slot machines produced income of $2.1 million. Income from those illegal activities funded the unpermitted expansion of Baron's physical plant onto environmentally protected wetlands.
The individual defendants are the Baron's corporate officers, executive board members, and a single employee. None of the Baron's other members is named in the indictments. Over the years, the Baron's membership included numerous public officials and servants, including the mayor, a member of the township council, members of the Legislature, a municipal judge, township employees, a member of the Board of Chosen Freeholders, an employee of the State Division of Gaming Enforcement, and members of local and state police forces. The defendants contend arguendo that other members of the club participated in the alleged illegal activity and that the defendants have been unfairly selected for prosecution, and that the Attorney General deceived the Grand Jury by informing it that an investigation and charges against law enforcement and politically connected Baron members would be pursued.
The State Grand Jury was impanelled on Dec. 2, 1998, and met seven times (Dec. 2, 9, 16, 23, 30, 1998, and Jan. 6, and 20, 1999) before returning the "gambling" indictment on Jan. 20, 1999, against the Baron *231 and its officers. At an additional session conducted on Jan. 27, 1999, the Grand Jury handed down the "wetlands" indictment against the Baron, its president and a member-engineer/surveyor who helped plan expansion of the club's facilities. The Grand Jury's term, which was to expire on Feb. 9, 1999, has been extended five times at the request of the Attorney General. Its present term is to expire May 8, 2000. In the 14 months since the return of the indictments, no additional evidence has been presented to the Grand Jury.
Evidence presented to the Grand Jury supported the State's contentions that the defendants violated gambling and wetlands laws. State Police investigators identified the role that each defendant had played in the management of the club and explained in detailed fashion the operation of the club's gambling enterprises. Other witnesses addressed the Baron's violations of environmental laws.
Baron members paid annual dues of $50, insufficient to support the financing of the club's $1.7 million facility and attendant operating expenses. The primary source of the club's income was a lottery conducted by the Baron itself. "The ticket," as it was known, was run five or six times a year and produced averaged annual income of $320,000 between 1984 and 1998. Slot machines and joker poker produced annual income of $160,000. At orientation meetings for new members, the club's revenue raising practices were explained. The orientation was straightforward; new members were informed of the importance of "the ticket" to the club's financial stability, the officers blatantly informing new members that the ticket was illegal.
The defendants do not offer a substantive challenge to the indictments. They do not dispute the quantum or the quality of the evidence submitted to the Grand Jury. They do contest, however, the fairness of the proceedings by which the indictments were obtained, asserting that the Attorney General hoodwinked the Grand Jury into returning indictments against these defendants by promising a continuing investigation into the conduct of members who were politically connected or employed in law enforcement. Thus, for the purposes of this motion, the court's focus is not on the conduct of the defendants or unindicted persons, but on the circumstances under which the indictments were procured.

THE STATE GRAND JURY PROCEEDINGS
Throughout the Grand Jury proceedings, grand jurors repeatedly made inquiries regarding the nature and proper focus of the Grand Jury investigation and the reason why the State had restricted the list of targets. On Dec. 16, 1998, after the presenting Deputy Attorney General explained to the Grand Jury how the Baron functioned, a juror inquired:
A JUROR: Going into that, are we going after the lower level people, because it would sound like any club member that sold tickets was breaking the law? It would sound like everybody did.
D.A.G.: The way I would like to respond to that question at this point is to indicate to you that might be a question best held until a little later. First off, it may be a subject for deliberation within and among the panel outside of my presence and outside of the court reporter's presence because, as you recognize, everything that goes on in here must necessarily be on the record. That is something you might want to discuss outside of the record. But I guess beyond all that, I would ask you to hold that question if you would, make a note of it so that it can be addressed later. But I believe that *232 at some further point that might be better discussed. There may be statutory language that impacts on that question. So basically what I'd like to do is give you a non-answer to that at this point.
During a colloquy between the Deputy Attorney General and the Grand Jury the issue of police officers being members was raised.
A JUROR: In the video we saw at the beginning, I think for the member
D.A.G.: By that you're referring to the December 13, 1991 orientation tape?
A JUROR: Yes. It had references to police officers being members of the club.
D.A.G.: All right.
A JUROR: Now
D.A.G.: Again, your recollection has to govern what's on the tape.
A JUROR: That's my recollection of it. I know there was a reference. In reviewing all these membership records, was any review made to identify whether there were or were not any police as members of the club, and what, if anything is being done to handle that situation?
D.A.G.: The membership applications have been marked as exhibits. They are marked as exhibits, I believe 8 and 8-A, yes, which lists employment at least as of date of membership or date of application. At this particular juncture of the presentation, it is focused on the operation and management of the Baron as the corporate entity and the people responsible for some of that operation, as those individuals are identified or their employment are germane to that, it's been provided. The issues related to other aspects are not contemplated to be included in the presentation at this juncture as it relates to what we're doing here. That's not to say that the issue you raise as to police officers, law enforcement officers' duties and functions will not be done at a later time, but it is not a part of this particular presentation at this juncture. Does that answer the question?
A JUROR: Yes
D.A.G.: Okay. All right. How about if we ask him this question. Whether, in fact, they identified, by that I mean the continued investigation has identified any individuals who were of are members of any law enforcement agency, by that just a number. Is that acceptable at this point?
A JUROR: Yes.
The Deputy Attorney General then elicited the following testimony from State Police Det. Sgt. Matthew Hartigan:
Q. Has the investigation established that some number of members were or currently are members of law enforcement agencies?
A. Yes.
Q. You don't have a specific number readily available?
A. I don't, only because sometimes we had names and allegations they were police officers, they really weren't. Sometimes the people were deceased, so I don't have an accurate answer for you.
Q. That's a matter that's still under investigation and review?
A. Yes.
The issue of police and government employee members was raised again during the testimony of Katherine Pica, a former Baron employee, who, when asked when she first realized that the club had not procured necessary licenses and approvals, responded that it was a "tough question with so many members being of high prestige, *233 I knew they weren't statewide legal but because there were so many politicians and police I guess I thought it was an unwritten law just done for the members..." [G.J. Transcript 12/23/98, p. 133, 1.6 to 7].
The Grand Jury presentation as to the gambling and liquor charges concluded on Jan. 20, 1999. A proposed form of indictment was provided to the Grand Jury and read in its entirety. The Deputy Attorney General concluded by stating, "Mr. Deputy Foreperson, I now present to you the proposed form of indictment for the Grand Jury's consideration and deliberations. I will retire and await your further call." Thereafter, the Grand Jury posed these questions:
A JUROR: So we have thoughts that there could be other laws involved and/or other defendants possibly involved beyond the list that you have given us, then we cannot or should not be considering them at this point in time.
D.A.G.: I don't knowagain your deliberations, I don't know what your thought process is. I'm not a party to the thought process as to specific individuals you have in mind as to this activity or as it relates to other activity.
A JUROR: Not speaking for everybody here, other individuals, other members of the association, perhaps not being corporate officers or senior officers of various activities could very well be viewed as part of the activity going on.
D.A.G.: Before you
A JUROR: Would it be easierI think he's trying to say we're not going to eliminate anybody in the future by voting on this? Is that what you're trying to say?
A JUROR: That is another way to get to it.
D.A.G.: Hang on a second.
(The Deputy Attorney General returned to the room.)
D.A.G.: To answer the panel's question, at this point what is being presented to you for your consideration are those individuals and the corporation that I provided the names. If during your continued investigation you identify other individuals, specific individuals that you believe have violated the statutes I have read to you this morning, or during your investigation you identify any other individuals who have violated any other statutes that may be applicable by way of individuals that might have a duty or responsibility to take action or non-action, depending upon how the investigation unfolds before you, you can deal with those at that time.
A JUROR: Yes, so pretty much any time up to close to any kind of interaction with this grand jury that we can do that.
D.A.G.: Yes.
A JUROR: On this case?
D.A.G.: Yes.
D.A.G.: At this time what is before you is the core of the presentation. As I believe I indicated before, I don't remember which grand juror had asked about the role of the police officers several weeks ago, I think probably three or four weeks ago. I believe my response at that time was all due things in their time. You are going to have a continued investigation. I would indicate that the component will be one of the components, among others, that could be and will be, as you indicated, you want to look at those who might have had responsibility to take some sort of action. So today's *234 draft as presented, those individuals whose names have been mentioned as with the corporation, focus on that activity and no one what one might call responsibility by way of a duty to do something. That I would represent to you we will focus on, on another day. Because this panel has indicated, clearly indicated they wish to explore that, we will, in fact, explore that with the panel.
The Grand Jury was called back into session on Jan. 27, 1999, to resolve the wetland aspect
Upon conclusion of additional testimony regarding the wetlands issue, the Grand Jury had more questions about the investigation of other Baron members. The Deputy Attorney General and the Grand Jury engaged in a lengthy discussion regarding the Grand Jury's desire to investigate further, the Deputy Attorney General promising to do so.
DAG: I understand the panel has some questions.
A JUROR: Just a general question. I think you may be getting at here, you are investigating looking into other members of Baron being involved in any of these issues we talked about this morning?
DAG: The way I want to answer that is basically pick up on part of my response from last week when it began from other members of the panel, there was a question as to other individuals who might have had responsibility or duty in connection with their conduct. I believe part of my response at that point was if the panel had particular names it was interested in, you're empowered to tell us, communicate that to me, we can sort it out.
The prosecutor's job before the State Grand Jury is to marshall the evidence for the panel. By that I mean to acquire, develop, assemble the evidence for presentation to you.
What you have done up to this point is to explore the general framework and understanding what the Baron was. I said that in the nature of the indictment you voted and returned last week. Today you're hearing another action with respect to an ongoing process. It is a process that continues
I am aware of your interest in assuring that we explore and examine those who might have responsibility. The panel has made that clear. It is something we're mindful of. I'm personally mindful of it. As we're able to develop that information to provide it to you, we will, which as I understand it, the panel is interested in exploring and understanding public officials who might have had knowledge and/or a role, by that I mean a duty, as well as I believe police officers.
Are there any other class of individuals, that's individuals you understand are public servants with a duty who might also have had knowledge, police officers who would have a duty and knowledge, and have I missed any class generally?
By public officials, including state, local and county.
A JUROR: And DEP officials.
DAG: And I take it from that comment, obviously I know the members of the panel have been exploring and examining the evidence, including the application files, so I understand you have a frame of reference. So yes, as that material is developed and is available consistent with the rules under which we operate, our ethical obligation, we will present that material to you
*235 A JUROR: That will come at the instigation of us?
DAG: We're aware of that. In fact, we're trying to present this to you in a more orderly fashion. We have presented essentially the core conduct. You have made certain findings as to the nature of that conduct. Now it is possible based on that framework understanding to then present to you individuals who might have a duty vis-a-vis that conduct. It's not necessary to read the law of misconduct, I would read that law to you premised upon duty.
A JUROR: So you are going through the past and present members, all of the members of The Baron in the relevant time period and categorizing those?
DAG: And as consistent with our rules. By that I mean an ethical obligation as prosecutors, our responsibility to the State Grand Jury, as that material is available it will be presented to you for consideration.
A JUROR: It will be shared, so we could possibly see a list, something we can look at instead of going through books of all the members, this is what they do?
DAG: Whether there would be some formalized list that would be prepared by us, obviously that would have to come through testimony as to individuals that were being presented to you. That's one methodology by which it can be done. There are several methods we can use. I don't want to speak to the methods today, that's something that I don't want to say to you I'll see in one fashion when we do it in a different fashion.
I am aware of your interest in proceeding with this matter further and exploring it, take it to wherever it leads. I assure you as an officer of the court, as the Deputy Attorney General before you, that, in fact, we will do that.
A JUROR: Maybe a list like that would be very helpful.
DAG: I understand that. As best we're able within the confines of our operating procedures, we will do that. As I think you probably gather now, your term generally would be expiring February 9 or 10. I would anticipate we will be making an application to extend you so we can explore this further.
A JUROR: We're talking individuals, but like how about the Township of Hamilton itself? Should they bethey overlooked the matter, shouldn't they be penalized, especially the flood control?
DAG: First off, I'm not aware of any material that's been presented to you so far as to any responsibility to any individuals, absent those who you have now dealt with by way of either wetlands matters or the core gambling, racketeering, money laundering conduct which has been the primary focus of the presentation to date.
For the purposes of this presentation, person does not include governmental entities as an entity and we get down that line. I will read that law to you.
A JUROR: That doesn't stop us from going through the ones we're mentioning now?
DAG: No, the individual
A JUROR: The inspectors that should have been aware of what was going on?
DAG: That is something, all of it is within your purview. There are other methodologies. This grand jury had *236 its charge. The grand jury knows of its authority and ability.
The answer to the question that was posed focuses on criminal prosecution, not on other remedies or other avenues that the grand jury has available to it, but we're not at any of those junctures yet. We'll find out what the evidence is and get it presented to you in hopefully as orderly a fashion as we've been able to do so far. Then grand jury can make a decision and deliberation and determine what it wants to do. But I am aware of your concern, of your belief, your need to continue this investigation and look further. In fact, we're moving to accomplish that on your behalf.
Any other questions?
All right. With that, again I'm not sure whether the record indicated this morning, but again all matters, everything that has been marked as an exhibit were present in the grand jury for your use and review as you saw fit.
With that, I believe we're adjourned.

GOVERNING LAW

Jurisdiction/Authority of the Court
"The grand jury has always occupied a high place as an instrument of justice in our system of criminal law." State v. Del Fino, 100 N.J. 154, 165, 495 A.2d 60 (1985). The chief role of the grand jury is to find whether "a basis exists for subjecting the accused to a trial." Trap Rock Indus, Inc. v. Kohl, 59 N.J. 471, 487, 284 A.2d 161 (1971) cert. denied, 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). "In seeking an indictment, the prosecutor's sole evidential obligation is to present a prima facie case that the accused has committed a crime." State v. Hogan, 144 N.J. 216, 236, 676 A.2d 533 (1996).
The grand jury itself serves the dual purpose of determining whether an accused should be subjected to trial, while simultaneously serving "to safeguard citizens against arbitrary, oppressive, and unwarranted criminal accusations." State v. LeFurge, 101 N.J. 404, 418, 502 A.2d 35 (1986); State v. Porro, 152 N.J.Super. 179, 184, 377 A.2d 909 (App.Div.1977); State v. Smith, 102 N.J.Super. 325, 246 A.2d 35 (Law Div.1968); United States v. Calandra, 414 U.S. 338, 342, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Although the grand jury is not the final adjudicator of guilt and innocence, the presence of the right to indictment in the state constitution indicates that the grand jury was intended to be more than a rubber stamp for the prosecutor's office. State v. Hogan, supra at 236, 676 A.2d 533; see also, State v. Engel, 249 N.J.Super. 336, 359, 592 A.2d 572 (App.Div.1991).
A prosecutor's interaction with the grand jury and possible misconduct is subject to judicial review. United States v. Serubo, 604 F.2d 807 (3d Cir.1979).
[The] dismissal of an indictment may impose important costs upon the prosecution and the public. At a minimum, the government will be required to present its evidence to a grand jury unaffected by bias or prejudice. But the costs of continued unchecked prosecutorial misconduct are also substantial. This is particularly so before the grand jury, where the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full *237 opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened. Id. at 817.
Relying upon Serubo, supra, and United States v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352, (1992), the New Jersey Supreme Court found that "precedents make clear that this Court may invoke its supervisory power to remedy perceived injustices in grand jury proceedings." State v. Hogan, 144 N.J. 216, 231, 676 A.2d 533 (1996). Consequently, jurisdiction rests with this court when it reviews the facts of the case at bar and considers the defendants' motions to dismiss. The scope of a court's review is limited and indictments are not to be disturbed, except upon a showing of fundamental unfairness to a defendant or the intentional subversion of the grand jury process by the prosecutor. It is an arduous task for any defendant to meet the burden of proof sufficient to dismiss an indictment on the basis of either prosecutorial misconduct or selective prosecution. The prosecutor enjoys broad discretion in presenting a matter to the grand jury and, thus, a presumption of validity attaches to grand jury proceedings. State v. Perry, 124 N.J. 128, 590 A.2d 624 (1991); State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 472 A.2d 1050 (1984).
An indictment may be dismissed only upon a palpable showing of manifest deficiency, State v. Wein, 80 N.J. 491, 501, 404 A.2d 302 (1979), or upon a showing that the conduct of the prosecutor amounted to an "intentional subversion" of the grand jury process. State v. Murphy, 110 N.J. 20, 35, 538 A.2d 1235 (1988). Consequently, "dismissal of the indictment is appropriate only `if it is established that the violation substantially influenced the grand jury's decision to indict,"` or if there is "grave doubt" that the determination ultimately reached was arrived at fairly and impartially. Bank of Nova Scotia v. United States, 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), quoting United States v. Mechanik, 475 U.S. 66, 78, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). Unless the grand jury's fair and impartial decision-making process has been affected by the prosecutor's misconduct, courts will not interfere with the results. State v. Laws, 262 N.J.Super., 551, 621 A.2d 526 (App.Div.1993), certif. denied. 134 N.J. 475, 634 A.2d 523 (1993).

Selective Prosecution
The individual defendants contend that they have been singled out for prosecution, an argument that the State describes as "shameless," the State arguing that the defendants are not part of any constitutionally protected class (e.g., race, gender, age, or ethnicity) and, therefore, the defendants assertion of discriminatory prosecution must fail.
Selectivity in enforcement is not per se a constitutional violation. The selection of a defendant must be "deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification in order to constitute a violation" of constitutional protections. Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). Even in the event of discriminatory selection, there must be a further showing that the discrimination is clear and intentional. Snowden v. *238 Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944).
A prosecutor may choose his targets, but, absent a bona fide reason, he may not treat similarly situated people differently, including some but excluding others in the indictment process. In Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985), the United States Supreme Court laid down the general rule governing discriminatory enforcement cases:
"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d. 604 (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.
Relying upon Wayte v. United States, supra, the Supreme Court of New Jersey, in State v. DiFrisco, 118 N.J. 253, at 266, 571 A.2d 914 (1990), set forth a two-prong test requiring the "petitioner to show both that ...the enforcement system has a discriminatory effect and that it was motivated by a discriminatory purpose." The defendant's burden is a heavy one. Id.

Prosecutorial Misconduct
The defendants charge the State with misleading the Grand Jury for the purpose of obtaining the present indictments. The defendants bear the burden of proving prosecutorial misconduct. State v. Manney, 24 N.J. 571, 133 A.2d 313 (1957); State v. CibaGeigy, 222 N.J.Super. 343, 536 A.2d 1299 (App.Div.1988). Unless a prosecutor engages in misconduct, which is extreme and clearly infringes upon the jury's decisionmaking function, an otherwise valid indictment should not be dismissed. State v. Murphy, 110 N.J. 20, 538 A.2d 1235 (1988); State v. Engel, 249 N.J.Super. 336, 592 A.2d 572 (App.Div.1991), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991).
Essential to resolving the issue of prosecutorial misconduct is an understanding of the workings of a present-day grand jury. It is the prosecution that marshals and presents the evidence to the grand jury. In re Tuso, 73 N.J. 575, 580, 376 A.2d 895 (1977); State v. Hilltop Private Nursing Home, Inc., 177 N.J.Super. 377, 426 A.2d 1041 (App.Div.1981). As the Court explained in United States v. Sells Engineering, Inc., 463 U.S. 418, 430, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983):
A modern grand jury would be much less effective without the assistance of the prosecutor's office and the investigative resources it commands. The prosecutor ordinarily brings matters to the attention of the grand jury and gathers the evidence required for the jury's consideration. Although the grand jury may itself decide to investigate a matter or to seek certain evidence, it depends largely on the prosecutor's office to secure the evidence or witnesses it requires. The prosecutor also advises the lay jury on the applicable law. The prosecutor in turn needs to know what transpires before the grand jury in order to perform his own duty properly. If he considers that the law and admissible evidence will not support a conviction, he can be expected to advise the *239 grand jury not to indict. He must also explain indictments, and the basis for their issuance, to determine whether it is in the interests of justice to proceed with prosecution.

[Emphasis added.]
Prosecutorial misconduct before both petit and grand juries has been addressed by our courts. In United States v. Serubo, supra, the Third Circuit remanded a case to the trial court with an instruction that a finding of "several instances of borderline conduct before the grand jury" would mandate dismissal of the indictment on the basis of prosecutorial misconduct. In State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987), the Court held that "prosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial."
The law possesses a greater tolerance for prosecutorial misconduct before a grand jury than it does before a petit jury. State v. Schamberg, 146 N.J.Super. 559, 370 A.2d 482 (App.Div.1977).
The prejudicial effect of prosecutorial conduct must be judged from a different viewpoint when it occurs before a grand jury as compared with a petit jury. Improper overreaching comments before a petit jury often result in judicial intervention through mistrials or reversals because of the court's sensitivity to the prejudicial impact of a prosecutor's comments upon the body which determines the guilt or innocence of defendant. Contrariwise, a chance remark or improper question before a grand jury does not affect the ultimate determination of the defendant's guilt and therefore should not be judged with as critical an eye. See State v. Riley, 97 N.J.Super., 542, 548, 235 A.2d 503 (Co.Ct.Law Div.1967), aff'd 101 N.J.Super. 402, 244 A.2d 513 (App.Div.1968), aff'd 53 N.J. 576, 252 A.2d 153 (1969), cert. denied, 390 U.S. 969, 88 S.Ct. 1085, 19 L.Ed.2d 1177 (1968).
Unless the prosecutor's misconduct before a grand jury is extreme and clearly infringes upon the jury's decision-making function, it should not be utilized as a stepping stone to dismissal of an indictment. As has often been observed, an indictment should only be quashed on the clearest and plainest of grounds. Id. at 563-564, 235 A.2d 503.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
It is within the court's province to examine grand jury proceedings and provide remedies when irregularities occur. Here, the defendants charge the Attorney General with selective prosecution and prosecutorial misconduct. The burden of proof is theirs.
The record reveals that from the outset of the Grand Jury proceedings, the defendants were targeted for indictment, but they were not part of a constitutionally protected class. As a matter of fact, there exists a rational basis for separating the defendants from other members of the club: the defendants were all officers of the club and responsible for its operation. As a matter of law, the defendants do not constitute a protected class based on age, race, gender, religion or ethnicity positioned to assert a violation of equal protection standards.
The defendants have not met the twoprong test of State v. DiFrisco, supra, requiring that they show that the enforcement has had a discriminatory effect and that it was motivated by a discriminatory purpose. A rationale exists for the segregation of these defendants from other *240 members of the Baron A.A. While the motivation of the prosecutor in limiting the indictment to these defendants alone is open to speculation, the court cannot substitute its judgment for that of the Attorney General, who must consider factors such as the strength of the case, the prosecution's general deterrence value, the State's priorities and the case's relationship to the State's overall law enforcement plan. Sufficient evidence was presented to the Grand Jury to warrant indictment of the defendants. Absent a clear showing of intentional discrimination, the court will not interfere in the Attorney General's selection process. The defendants' motions for dismissal predicated upon selective prosecution are denied.
The remaining issue before the court is not whether there was prima facie evidence to indict, but whether the conduct of the Deputy Attorney General constitutes prosecutorial misconduct. To achieve dismissal of the indictments against them, the individual defendants must establish on the clearest and plainest of grounds that the prosecutor's conduct was so egregious that it deprived them of a fair hearing, creating a grave doubt whether they would have otherwise been indicted. This court concludes that the individual defendants have met that standard of proof and are entitled to dismissal of the charges against them.
The court concludes that the Deputy Attorney General's responses to the often-expressed genuine concerns of the grand jurors were evasive and contained broken promises upon which the Grand Jury relied when it handed down these indictments. The derelictions of the State are easily gleaned from a review of the grand jurors' inquiries and the Deputy Attorney General's responses.
At its first session on Dec. 2, 1998, the grand jurors received Exhibit 8, two large notebooks containing membership applications, a virtual membership roster of the Baron A.A.
At the Dec. 16, 1998 session, a grand juror observed that it seemed as if most club members may have violated the law and asked: "Are we going after lower level people, because it would sound like any club member that sold tickets was breaking the law?" The Deputy Attorney General replied: "The way I would like to respond to that question at that point is to indicate to you that might be a question best held until a little later ... so basically what I would like to do is give you a non-answer to that at this point." The Grand Jury again pressed the question: "In reviewing all these membership records, was any review made to identify whether there were or were not any police as members of the club, and what, if anything is being done to handle that situation?" The Deputy Attorney General responded obliquely: "At this particular juncture of the presentation it focuses on the operation and management of the Baron as the corporate entity and the people responsible for that operation, .. that's not to say that the issue you raise as to law enforcement officers' duties and functions will not be done at a later time, but it is not part of this particular presentation at this juncture." The Deputy Attorney General supported his position by eliciting additional testimony from an investigator, who conceded that law enforcement officers were members of the Baron and informed the Grand Jury that the matter was still under investigation and review.
At the Jan. 20, 1999 session, the Deputy Attorney General presented the "gambling" indictment to the Grand Jury. A grand juror asked: "[W]e're not going to eliminate anyone in the future by voting on this?" Faced with that pointed question, the Deputy Attorney General responded, *241 "Hang on a second," and then left the grand jury room. He later returned and provided the Grand Jury with an adroit response that was cleverly misleading:
[A]t this point what is being presented to you for your consideration are those individuals and the corporation that I provided the names. If during your continued investigation you identify other individuals, specific individuals that you believe have violated the statutes I have read to you this morning, or during your investigation you identify any other individuals who have violated any other statutes that may be applicable by way of individuals that might have a duty or responsibility to take action or non-action, depending upon how the investigation unfolds before you, you can deal with those at that time.

[Emphasis added.]
By that response, the Deputy Attorney General sought to abrogate his role as prosecutor and shift it to the Grand Jury. His answer was a crafty and subtle confusion of a grand jury's de jure authority and its de facto role. Suddenly, the investigation, which had been conducted by the State, became the Grand Jury's investigation. Suddenly, it became "you," the grand jurors, who were to identify individuals who violated the law and, depending upon how the grand jurors' investigation unfolded, it was "you," the grand jurors, who would have to deal with those findings.
Grand juries possess dual powers to investigate and decide. It is rare that a grand jury exercises its investigative authority. Rather, it hears the evidence presented and determines whether an indictment should be returned. As explained in United States v. Sells Engineering, supra, the prosecutor ordinarily gathers the evidence and presents it to the grand jury for its consideration. Although a grand jury itself may decide to investigate a matter, it depends largely on the prosecutor's office to secure the evidence or witnesses it requires. A modern grand jury cannot function without the assistance of the prosecutor's office and the investigative resources it commands.
Here, the investigation was conducted by the State, which marshalled the evidence and presented it to the Grand Jury. The Grand Jury investigated nothing. Its function in this matter was to evaluate the evidence presented by the State and weigh the propriety of indictment. The Deputy Attorney General's suggestion that the investigation was the Grand Jury's responsibility distorts the relationship between the State and this Grand Jury. He repeatedly sidestepped the Grand Jury's repeated inquiries concerning the involvement of law enforcement officers and politically connected persons.
At the last session of the Grand Jury on Jan. 27, 1999, the Deputy Attorney General continued to evade the grand jurors' questions while acknowledging awareness of their interest in the conduct of public officials who belonged to the Baron. "The panel has made that clear. I'm personally mindful of it. As we're able to develop that information to provide it to you, we will ..." Later, he informed the grand jurors: "I am aware of your interest in proceeding with this matter further and exploring it. Take it to wherever it leads. I assure you as an officer of the court, as the Deputy Attorney General before you, that, in fact, we will do that." A few moments later: "... I am aware of your concern, of your belief, your need to continue this investigation and look further. In fact, we are moving to accomplish that on your behalf."
The Deputy Attorney General's responses to the grand jurors questions portray a consistent pattern of deception. Standing alone, any one remark might be considered *242 inadvertent, a mistake, or harmless comment, but taken together they present a mosaic of clear intent to deceive the Grand Jury into returning these indictments.
The Deputy Attorney General noted that the Grand Jury's term was scheduled to expire on Feb. 9, 1999, and that it probably would be extended. The grand jurors had every reason to believe that additional evidence concerning the complicity of others would be presented to them. Now, 14 months later, its term extended five times, the Grand Jury has heard no further evidence.
The Deputy Attorney General deceived the Grand Jury by:
1. Telling the grand jurors that it was their investigation, when in fact it was the State's investigation;
2. Avoiding the grand jurors' inquiries concerning the prosecution of other members of the club, especially law enforcement officers;
3. Misrepresenting to the Grand Jury that its clearly expressed desire to explore the conduct of governmentally connected persons would be honored, and
4. Failing to continue the investigation and present further evidence as promised.
The fact that the deception continued after the "gambling" indictment was returned does not diminish the adverse influence wielded by the Deputy Attorney General before return of the "gambling" indictment. The continuation of the deception after the return of "gambling" indictment only reinforces the court's conclusion that the Grand Jury was deceived.
Parenthetically, the court notes that a grand jury is not required to indict anyone, even in the face of illegal activity. Neither the prosecutor nor a court can order a grand jury to return an indictment. The grand jury acts as the conscience of the community and it may no-bill a proposed indictment, even in the face of convincing evidence. By way of example, prior to the adoption of our present statute granting homeowners greater latitude in the protection of their premises, a homeowner could use deadly force against an intruder only if it appeared that the intruder represented a threat to the homeowner's life. Unarmed intruders and fleeing burglars, who posed no threat to a homeowner's life, were sometimes shot and killed by homeowners, subjecting the homeowners to possible homicide indictments based upon the use of excessive force. Regularly, grand juries declined to indict in those circumstances.
The presentation of prima facie evidence to the grand jury should not presume indictment. The grand jury may possess a sense of fair play that exceeds that of the prosecutor, and the grand jury may, in its wisdom, decide "all of the desperadoes or none of them." Thus, the grand jury serves as a protection against overzealous prosecution and unintended application of the law.
In most grand jury proceedings the defendant is not present. His attorney is not present. The prosecutor, whose ostensible goal is conviction, is the one upon whom the defendant must rely for a fair hearing. Exposed to indictment, not represented, a citizen stands before a grand jury as naked as a jaybird in a Kansas snowstorm. In that setting, the prosecutor bears an enhanced obligation to ensure fair play.
The fact that the State has presented prima facie evidence to warrant indictment does not absolve the State of its "fair play" obligation. The issue here is not whether there was enough evidence to indict these defendants, but whether they would have been indicted at all had the prosecuting attorney responded to the grand jurors' questions in a direct, *243 straightforward manner. The court concludes that he was derelict in candor and that his conduct casts a grave doubt that these defendants otherwise would have been indicted.
Whether characterized as prosecutorial misconduct or selective prosecution, the prosecutor's failure to pursue further investigation of other members of the club,after a promise to the Grand Jury that he would do so, deceived the grand jurors, who relied upon the prosecutor to proceed in an evenhanded fashion, and warrants dismissal of the charges against all persons named in the indictments.
The court leaves intact the indictments as to the Baron A.A. There is ample evidence to suggest that the Grand Jury would have indicted the Baron A.A. under any circumstances, especially because an indictment of the Baron is, in effect, an indictment of its entire membership.
Accordingly, the court enters orders in conformity with its opinion.