859 A.2d 1239 (2004)
372 N.J. Super. 554
NEW JERSEY STATE ASSOCIATION OF NURSE ANESTHETISTS, INC., Appellant,
v.
NEW JERSEY STATE BOARD OF MEDICAL EXAMINERS, Respondent.
New Jersey State Society of Anesthesiologists, Respondent/Intervenor.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 2004.
Decided November 3, 2004.
*1240 Alma L. Saravia, Cherry Hill, argued the cause for appellant (Flaster Greenberg, attorneys; Ms. Saravia and Vincent J. Nolan III, of counsel and on the brief).
Sharon M. Joyce, Assistant Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Michael Haas, Assistant Attorney General, of counsel; Ms. Joyce, on the brief).
Joseph M. Gorrell, Roseland, argued the cause for respondent/intervenor (Wolf, Block, Schorr & Solis-Cohen, attorneys; Mr. Gorrell and John D. Fanburg, of counsel; Mr. Gorrell and Richard B. Robins, on the brief).
Stephen Eisdorfer, Princeton, argued the cause for amicus curiae for American Association of Nurse Anesthetists (Hill Wallack, attorneys; Mr. Eisdorfer, on the brief).
Robert J. Conroy, Bridgewater, argued the cause for amicus curiae The Medical Society of New Jersey (Kern, Augustine, Conroy & Schoppmann, attorneys; Mr. Conroy on the brief).
Jahos, Broege & Shaheen, Little Silver, attorney for amicus curiae New Jersey State Nurses Association (Evan William Jahos, on the brief).
Wolf, Block, Schorr & Solis-Cohen, Cherry Hill, and Scott T. Kragie (Squires, Sanders & Dempsey) of the Ohio and the District of Columbia bars, admitted pro hac vice, attorneys for amicus curiae American Society of Anesthesiologist (Joseph M. Gorrell and Scott T. Kragie, on the brief).
Before Judges LEFELT, ALLEY and FUENTES.
The opinion of the court was delivered by
ALLEY, J.A.D.
In recent years, physicians have been performing an increasing number of surgical procedures in their offices, rather than in hospitals. Often, certified registered nurse anesthetists ("CRNAs") or anesthesiologists have administered anesthesia during such office procedures. On May 19, 1997, the State Board of Medical Examiners ("BME") proposed regulations, subsequently codified at N.J.A.C. 13:35-4A.1 to -4A.18, setting forth standards for the administration of anesthesia in physicians' offices during non-minor surgeries and procedures. 29 N.J.R. 2238(a) (May 19, 1997).
The BME, apparently spurred by a young girl's death after anesthesia was administered to her by an unsupervised CRNA, provided in the proposed regulation that doctors who performed procedures necessitating anesthesia in their offices, as opposed to hospitals or ambulatory care sites, would need to meet certain requirements if they chose to employ CRNAs to administer the anesthesia. *1241 One such requirement was that the CRNA be supervised by an anesthesiologist or a Board-privileged physician not performing the procedure. The proposal was met with strong opposition from appellant, the New Jersey Association of Nurse Anesthetists ("NJANA"), which argues that the BME is regulating the profession in an unauthorized manner. Once the regulation was adopted, NJANA brought this appeal challenging its adoption.
The BME held a public hearing on the proposed regulation on June 9, 1997. Representatives from NJANA testified in opposition to the regulation. NJANA is a private non-profit organization representing the interests of over 400 CRNAs in New Jersey.
The regulation deals with three categories of anesthesia administration: general anesthesia, regional anesthesia and conscious sedation. See N.J.A.C. 13:35-4A.3 (setting forth the definitions necessary for interpreting the regulation). Under the regulation, "general anesthesia" is defined as "the administration of a drug ... which cause[s] loss of consciousness as the result of which the patient is unable to make meaningful responses but may still display reflex withdrawal from a painful stimulus." Ibid. "Regional anesthesia" is defined as "the administration of anesthetic agents to a patient to interrupt nerve impulses without loss of consciousness and includes epidural, caudal, spinal and brachia plexus anesthesia." Ibid. The definition of "conscious sedation" is
the administration of a drug ... in order to induce the state of consciousness in a patient which allows the patient to tolerate unpleasant medical procedures without losing defensive reflexes, adequate cardio-respiratory function and the ability to respond purposefully to verbal command or to tactile stimulation if verbal response is not possible as, for example, in the case of a small child or deaf person.
[Ibid.]
Under the regulation, the only individuals who may administer the three types of anesthesia are (1) physicians who meet certain privileging requirements or (2) CRNAs under the supervision of physicians meeting these privileging requirements. N.J.A.C. 13:35-4A.8(a),  4A.9(a), -4A.10(a).
Irrespective of how the physician obtained these privileges, the physician administering or overseeing the administration of anesthesia must also meet certain educational or certification requirements, depending on the type of anesthesia being administered. "[D]uring every consecutive three-year period beginning July 1, 2004," a physician administering or overseeing the administration of general anesthesia must "complete[] at least [sixty] Category I hours of continuing medical education in anesthesia[,]" N.J.A.C. 13:35-4A.9(a); a physician administering or overseeing the administration of regional anesthesia must "complete[] eight Category I hours of continuing medical education in anesthesia exclusively, or in anesthesia as it relates to the physician's field[,]" id. at -4A.9(a); and a physician administering or overseeing the administration of conscious sedation must "complete[] at least eight Category I or II hours of continuing medical education in any anesthesia services, including conscious sedation exclusively, or in anesthesia as it relates to the physician's field of practice," id. at -4A.10(a).
During a CRNA's administration of general and regional administration "the supervising physician" must "be physically present and available to immediately diagnose and treat the patient in an emergency, without concurrent responsibilities to administer anesthesia or perform surgery, *1242 other than minor surgery." Id. at -4A.8(c) & -4A.9(c). This differs from the requirement pertaining to the administration of conscious sedation, where "the supervising physician shall be physically present, but may be concurrently responsible for patient care." Id. at -4A.10.
On June 15, 1998, the BME adopted the regulation, but it reserved promulgation of the alternative privileging procedure, N.J.A.C. 13:35-4A.12, for a later date.
The BME held a public hearing on December 7, 2001 on the alternative privileging provision, and on November 13, 2002, adopted the provision, codified at N.J.A.C. 13:35-4A.12. The BME published the alternative privileging requirements in the New Jersey Register on December 16, 2002. 34 N.J.R. 4449, 4467-68 (December 16, 2002).
The alternative privileging provision required practitioners who did not hold privileges granted by a hospital but offered anesthesia during surgery in an office setting, to submit an application for alternative privileges within one year, by December 16, 2003. N.J.A.C. 13:35-4A.17 (a) & (c). The alternative privileging procedure, as it stands today, differentiates between general, regional and conscious sedation anesthesia in setting forth the criteria physicians administering or overseeing the administration of anesthesia must meet. Compare N.J.A.C. 13:35-4A.12(a) with N.J.A.C. 13:35-4A.12(b). The requirements for conscious sedation privileges are less intensive than the requirements necessary to obtain the privilege to administer regional and general anesthesia. Ibid.
On October 3, 2003, the New Jersey Board of Nursing (BN) granted a petition by NJANA to classify CRNAs as Advanced Practice Nurses (APNs) so long as the CRNA applying for the APN certification completed certain graduate course work. The BME withheld implementation of the supervision requirements of the subject regulations during various proceedings, and on March 17, 2004, we granted leave to appeal and stayed implementation of the regulations pending this appeal. We also granted the application of the New Jersey State Society of Anesthesiologists to intervene as respondent and allowed to appear as amici curiae the New Jersey State Nurses Association, the American Society of Anesthesiologists, the American Association of Nurse Anesthetists, and the Medical Society of New Jersey.
NJANA contends on appeal essentially that the BME's promulgation of N.J.A.C. 13:35-4A.1 to -4A.18 was without any factual or medical support, and thus was arbitrary.
Preliminarily, we note that the scope of our review of administrative regulations is extremely limited. Administrative agencies generally "possess wide discretion and authority to select the means and procedures by which to meet their statutory objectives; an agency itself is best suited to review its own regulations and, in deciding whether or not to change them, to choose the means by which to proceed." County of Hudson v. Dep't of Corr., 152 N.J. 60, 71, 703 A.2d 268 (1997). Administrative regulations enjoy a "presumption of validity." Council of N.J. State College Locals NJSFT v. State, 251 N.J.Super. 577, 584, 598 A.2d 1237 (App. Div.1991). A party that challenges such regulations bears the burden of showing they are arbitrary, capricious or unreasonable, or beyond the scope of the power delegated to the agency by the Legislature. Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980). Courts have a "strong inclination to defer to agency action provided it is consistent with the legislative grant of power." Lewis *1243 v. Catastrophic Illness Fund, 336 N.J.Super. 361, 369-370, 764 A.2d 1035 (App.Div.2001).
The practice of medicine is defined by statute as "the practice of any branch of medicine and/or surgery, and any method of treatment of human ailment, disease, pain, injury, deformity, mental or physical condition." N.J.S.A. 45:9-5.1. By statute, the BME is authorized to regulate the practice of medicine and to "make and adopt all necessary rules, regulations and by-laws not inconsistent with the laws of the State or the United States, whereby to perform the duties and to transact the business required under the provisions of this article (section 45.9-1 et seq)." N.J.S.A. 45:12-9.12. As a result, "[t]he Board specifically may adopt rules to protect the health, safety and welfare of its licensees' patients and provide standards for the practice of medicine in New Jersey." In re Promulgation of N.J.A.C. 13:35-6.14, 205 N.J.Super. 492, 498, 501 A.2d 547 (App.Div.1985). It is also not without significance that the medical practice statute's exemptions from its "prohibitory provisions" are, in the case of professional nurses, limited to those who are "operating in each particular case under the specific direction of a regularly licensed physician or surgeon." N.J.S.A. 45:9-21(k).
The BME is responsible for issuing licenses to individuals engaged in the practice of medicine. N.J.S.A. 45:9-6. Indeed, we have recognized that the BME has been delegated the authority to draw a line "between services which nonprofessionals could perform and those which must be limited to licensed health care providers." In re Promulgation of N.J.A.C. 13:35-6.14, supra, 205 N.J.Super. at 498, 501 A.2d 547.
In these circumstances, we see no basis for characterizing as arbitrary, capricious or unreasonable the line the BME has drawn between anesthesiologists and CRNAs in promulgating the regulation. Anesthesiologists receive more training to administer anesthesia and handle other medical problems that may arise during a surgery or the administration of anesthesia. NJANA states in its brief that the education and experience required to become a CRNA include:
A Bachelor of Science in Nursing or other appropriate baccalaureate degree.
A current license as a registered nurse.
At least one year's experience in an acute care nursing setting.
Graduation from an accredited school of nurse anesthesia educational program ranging from [twenty-four to thirty-six] months, depending upon university requirements. These programs offer a graduate degree and include clinical training in university-based or large community hospitals.
Pass a national certification examination following graduation and complete a continuing education and re-certification program every two years thereafter.
Anesthesiologists, on the other hand, have, as NJANA's brief further asserts,
four years of medical school, studying the fundamental science of the human condition[.] In addition, extensive clinical instruction and experience in medical diagnosis and therapy are received by medical students before the award of a medical degree or osteopathic degree. After medical school, anesthesiologists generally complete four years of residency training, including one year of clinical medicine; two years of clinical anesthesiology; and one year of concentrated study and experience in connection with the most serious complications. Following residency training, those anesthesiologists electing to obtain specialty *1244 board certification by the American Board of Anesthesiology (ABA) are required to take an oral and written certification examination.
Appellant relies on several studies in its attempt to show that the regulatory requirement for supervision of CRNAs is arbitrary. The studies show that mortality rates are the same amongst individuals receiving anesthesia from CRNAs working alone and those receiving anesthesia from an anesthesiologist. The BME persuasively points out, however, that the studies do not isolate and compare the mortality rates of anesthesiologists and CRNAs working in an office setting. In hospital settings, anesthesiologists are practically always on hand should a CRNA run into a problem while administering anesthesia. As a result, appellant's studies do not shed much light on whether the BME's regulation of office-administered anesthesia is arbitrary.
Appellant also points to cases in which it claims we have invalidated agency regulations for lack of factual or empirical justification. In one case, In re Adoption of N.J.A.C. 13:38-1.3(f), 341 N.J.Super. 536, 543-544, 775 A.2d 629 (App.Div.2001), the challenged regulation was that of the State Board of Optometrists. The enabling statute, N.J.S.A. 45:12-9.12, allowed optometrists to "practic[e] optometry at a rented location in a retail or commercial store." Further, the statute forbade agreements in which the landlord was able to influence or control the optometrist in his or her practice. Ibid. Claiming that it was authorized to act under N.J.S.A. 45:12-9.12, the Board of Optometrists adopted N.J.A.C. 13:38-1.3(f), prohibiting optometrists from entering into any revenue based agreement for the payment of any service, product or rental space unless the agreement was with an associate. We held that the Board's regulation fell outside of the scope of the enabling statute since the regulation was contrary to the Legislature's intent and since the Board failed to establish any factual basis connecting revenue based rent agreements to landlord control over optometrists. Id. at 635, 501 A.2d 547.
The CRNA supervision regulation is, appellant argues, similar to the regulation in In re Adoption of N.J.A.C. 13:38-1.3(f) in that no factual basis existed for the regulation. The core issue in In re Adoption of N.J.A.C. 13:38-1.3(f), however, was whether the Board of Optometry had legal authority in the first place to promulgate the regulation, rather than whether there existed a proper factual basis for the regulation. Here, the BME is doing exactly what it is authorized to do: promulgate reasonable licensing standards for its physicians. Further, though there exists little empirical data supporting the CRNA supervision requirements, there is a clear connection between setting these standards and the authority granted to the BME to license physicians.[1] Moreover, all parties affected by the instant BME regulations were involved and invited to participate in the regulation's creation through public hearings and meetings with the BME. The Legislature does not limit the Board to promulgating regulations based solely on medical research, especially when that medical research does not exist. Absent a study comparing mortality rates between anesthesiologists and CRNAs in an office setting, the Board should not have to wait for bad results to require that its physicians meet higher standards in the administration of patient care.
*1245 NJANA contends that by promulgating the anesthesiologist supervision requirements, the BME has placed New Jersey out of step with recent decisions that it says permit CRNAs to administer anesthesia without anesthesiologist supervision. NJANA points in particular to the Federation of State Medical Boards (FSMB), which has recognized that CRNAs may function without anesthesiologist supervision. In 2001, the Federation of State Medical Boards decided to form a committee to draft model guidelines for the regulation of outpatient surgery. At first, the FSMB indicated a preference for anesthesiologist supervision of CRNAs, but after the regulation was challenged by the American Association of Nurse Anesthetists ("AANA"), the FSMB changed its preference, allowing for either operating physicians or anesthesiologists to provide the supervision.
This undercuts, rather than supports, appellant's position. The FSMB still contemplates that CRNAs should be supervised though it removed the preference of anesthesiologist supervision. In our view, this buttresses the argument that it should be left to the BME to promulgate who should supervise CRNAs and how such supervision should take shape.
We further note that NJANA asserts that the Centers for Medicare and Medicaid Services have recognized that CRNAs do not require anesthesiologist or physician supervision. In its final form, that entity's rule states that anesthesiologists, physicians, CRNAs or other trainees may administer anesthesia and that non-physicians must be supervised by either an anesthesiologist or the operating physician. 42 C.F.R. 416.42(b). The rule does, however, provide that a state governor may decide to "opt out" of the CRNA supervision requirement, id. at 416.42(d)(1), thus leaving to the states the decision as to whether a CRNA should be supervised. Twelve states have opted out of the regulation. New Jersey is not one of those states, and this is consistent with the finding that CRNAs should be supervised.
We further conclude that appellant's contention that the Board acted outside the scope of its jurisdiction by regulating the practice of nursing in an unauthorized manner is also without merit.
As we have noted, state agency regulations enjoy a presumption of validity, and the presumption attaches so long as the agency acted within the powers delegated to it. Med. Soc'y of N.J. v. N.J. Dep't of Law and Pub. Safety, 120 N.J. 18, 575 A.2d 1348 (1990). The BME has the authority to regulate the practice of medicine, as we have already observed. Nursing, on the other hand, is regulated by the BN. N.J.S.A. 45:11-24. To become licensed as a CRNA, an individual must meet both the general nurse licensing requirements, N.J.S.A. 45:11-26 as well as specified nurse anesthetist licensing requirements, N.J.A.C. 13:37-13.1.
NJANA points to the United States Department of Health and Human Services as saying it "cannot agree that anesthesia administration is the practice of medicine and therefore can only be done after medical school training." 66 Fed.Reg. 4680 (January 18, 2001). NJANA does not set forth any further support for the conclusion urged besides its own assertions, however.
In our view, the administration of anesthesia is, in fact, the "practice of medicine" since it is used in the treatment of "human ailment, disease, pain, injury, [or] deformity." N.J.S.A. 45:9-5.1.
It is undeniable that N.J.A.C. 13:35-4A et seq., has an indirect impact on the CRNA profession, yet the point remains that the BME is not regulating the nursing *1246 profession, but rather the physicians who offer anesthesia in an office setting. Here, the regulation is directed at ensuring that physicians offering anesthesia services in their offices, as well as those supervising the administration of anesthesia, possess certain credentials. Thus, the challenged regulation falls squarely in the BME's core jurisdiction, the licensing and qualifications of physicians, and how they perform their professional services.
Finally, NJANA asserts that the CRNA supervision regulation establishes a guild for anesthesiologists, contrary to the New Jersey Supreme Court's ruling that such restrictions on competition are invalid. Cole Nat'l Corp. v. State Bd. Of Exam'rs, 57 N.J. 227, 233, 271 A.2d 421 (1970). The argument, too, is without merit. The regulation does not prohibit CRNAs from practicing with supervision in the office setting, nor does it preclude CRNAs from practice in other hospital and ambulatory care settings. We conclude that, through the regulations, the BME is merely endeavoring to insure that those who supervise the nurses meet qualification and performance standards it has reasonably concluded to be appropriate.
We have carefully considered, in light of the record and the applicable law, each of the contentions raised by appellant on this appeal, and we are satisfied that they are without merit. To the extent we have not specifically referred to those contentions above, we nevertheless are satisfied that they lack sufficient merit to warrant discussion in a written opinion, and we affirm pursuant to R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] We give no weight to NJANA's reliance on Center for Outreach and Services to the Autism Community v. Division of Developmental Disabilities, an unpublished opinion.