NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4361-19
A-4371-19
A-4374-19

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

YVONNE JEANNOTTE-
RODRIGUEZ,

      Defendant-Respondent.

_____

STATE OF NEW JERSEY,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

MARTA I. GALVAN,

      Defendant-Respondent/
      Cross-Appellant,

_____

STATE OF NEW JERSEY,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

| APPROVED FOR PUBLICATION |
| --- |
| **August 25, 2021** |
| **APPELLATE DIVISION** |

LISA FERRARO,

        Defendant-Respondent/
        Cross-Appellant.

_____

Argued June 3, 2021 – Decided August 25, 2021

Before Judges Ostrer, Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 19-06-0446.

Jay McCann, Chief Assistant Prosecutor, argued the cause for appellant and cross-respondent State of New Jersey (Camelia M. Valdes, Passaic County Prosecutor, attorney; Jay McCann, of counsel and on the briefs).

Nathan Kittner argued the cause for respondent Yvonne Jeannotte-Rodriguez (Nathan Kittner, attorney; Nathan Kittner and Jonathan Mincis, on the brief).

Amie E. DiCola argued the cause for respondent/cross-appellant Marta I. Galvan (The Law Offices of Fusco & Macaluso, PC, attorneys; Amie E. DiCola, on the brief).

Joseph Lewis Nackson argued the cause for respondent/cross-appellant Lisa Ferraro (Joseph Lewis Nackson, attorney; Joseph Lewis Nackson, of counsel and on the brief; Jeffrey Zajac, on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

2

In these three appeals, consolidated for our opinion, the State contends the trial court wrongly dismissed (without prejudice) a six-count indictment against Lisa Ferraro, M.D., Yvonne Jeannotte-Rodriguez, and Marta Galvan. During the relevant time period, Rodriguez served as a medical assistant in Dr. Ferraro's medical office, and Galvan was the office manager and worked on billing. The State alleged Rodriguez practiced medicine without a license; Dr. Ferraro and Rodriguez fraudulently billed for Rodriguez's services; and Galvan joined Rodriguez and Dr. Ferraro in conspiring to commit this fraud. The State asserts it presented sufficient evidence to survive dismissal and urges us to reinstate the indictment in full. Dr. Ferraro and Galvan cross-appeal, contending the court should have dismissed the indictment with prejudice.

We affirm. The trial court did not abuse its discretion in dismissing the indictment without prejudice. Most significantly, the prosecutor failed to adequately and accurately instruct the grand jury about what a medical assistant may do without encroaching upon the licensed practice of medicine. And, because the law does not clearly draw a line around a medical assistant's allowable activities, prosecuting someone for crossing the line may violate the right to fair warning.

The prosecutor also improperly referred to additional evidence that he did not present to the grand jury, and presented a questionable analysis of the

3

amount of money involved in the charged offenses. And the indictment lacked sufficient detail to give defendants a fair opportunity to mount a defense.

## I.

The indictment at issue in this appeal is not the first one the State obtained against the three defendants. In May 2018, the State secured a three-count indictment charging: Rodriguez with third-degree practicing medicine without a license, N.J.S.A. 2C:21-20 (count one); Dr. Ferraro with third-degree health care claims fraud, N.J.S.A. 2C:21-4.3 (count two); and Rodriguez, Dr. Ferraro, and Galvan with third-degree conspiracy to commit health care claims fraud, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:21-4.2 (count three). About a year later, the trial court dismissed the indictment without prejudice, holding it was "palpably deficient in its failure to produce any testimony before the grand jury to support the dates set forth in the indictment."[1]

The State then resubmitted the case, calling David Menendez, an insurance fraud investigator for Horizon Blue Cross/Blue Shield who did not testify in the first presentment, and Passaic County Prosecutor's Office Detective Lisa Patterson, who played excerpts of her recorded interviews of

---

[1] The parties did not provide us the transcript of the first grand jury or the court's decision dismissing the first indictment. But, in dismissing the second indictment, the court reviewed its reasons for dismissing the first one. We rely on that.

A-4361-19

Galvan and Dr. Ferraro. The State also granted Rodriguez's request to appear before the grand jury.

Patterson testified that Dr. Ferraro and Galvan actually prompted the investigation. They complained that Rodriguez, who had worked for many years as Dr. Ferraro's medical assistant, was getting paid to redirect Dr. Ferraro's patients to another doctor's office where Rodriguez had gone to work. Rodriguez had been a licensed physician in the Dominican Republic, but had not achieved licensure in New Jersey; although she passed various written examinations, she was unable to secure and complete the prerequisite residency.

Before the grand jury, Patterson presented evidence regarding the charge that Rodriguez held herself out as a licensed physician, or practiced medicine without a license. Patterson confirmed with the state regulating boards that Rodriguez was not licensed to practice medicine nor was she licensed as a "nurse . . . nurse practitioner . . . [or] a physician's assistan[t]." Shortly after leaving Dr. Ferraro's office, Rodriguez posted on Facebook a picture of herself in a white lab coat and a stethoscope. In Spanish, she assured her "patients" that she did not "abandon" them and supplied her new location.

Based on Patterson's interviews with five patients who switched practices, Patterson testified Rodriguez gave physical exams, administered

5 A-4361-19

allergy shots, and prescribed medications, and her services were billed to insurers under Dr. Ferraro's unique identification number. One patient, A.A.,[2] told Patterson that she believed Rodriguez was a doctor, and she knew Rodriguez was a doctor in the Dominican Republic. Rodriguez checked her blood pressure, and "ha[d] her sit down to examine her."

Another patient, H.M., told Patterson that she thought Rodriguez was a doctor, and when she called the office "they said [']Dr. Rodriguez['] and I told them that I wanted to be seen by Dr. Rodriguez and they said [']okay.[']" H.M. said that Rodriguez examined her ears, and checked her throat with a light; checked her heart with a stethoscope and her knee reflexes with a hammer; and took her blood pressure.

M.A. likewise told Patterson that Rodriguez checked her ears; took blood pressure and temperature; and inquired about the purpose of her visit. M.A. said that Rodriguez would ask Dr. Ferraro "if she could switch [M.A.'s] . . . medication, and [Rodriguez] for the most part would ask Dr. Lisa [Ferraro] what to do for [M.A.]." M.C. said that Rodriguez presented herself as "Dr. Rodriguez" when she came into the room, dressed in a white doctor's coat.

Patterson also presented her recorded interview with Marta Galvan, the office manager. Galvan stated Rodriguez worked as a medical assistant; "she

---

[2] We use initials to protect the patients' privacy. R. 1:38-3(a).

met with the patient and [got] all the patient history and stuff like that." Although Galvan acknowledged Rodriguez did not have a medical license in the United States, she referred to her as "Dr. Rodriguez" because "she obtained a doctoral degree in [the] D.R.," and "[p]atients would contact her by Dr. Rodriguez." Galvan admitted Rodriguez touched the patients, and she wrote in patients' charts, and typed patients' notes in the office's digital record-system once that was implemented. Galvan admitted Rodriguez would enter codes for billing under Dr. Ferraro's name (but she did not say that Rodriguez transmitted the claims to insurers). Galvan also stated Rodriguez wrote prescriptions using Dr. Ferraro's pad. Galvan's answer regarding how often Rodriguez did that was inaudible.

In a video interview with Dr. Ferraro that Patterson presented, Dr. Ferraro described Rodriguez's role:

> [S]he would get the ready patients [sic]. She learned how to do a complete history, physical, for all the medications. You know, everything . . . normally you would teach something, and then the physical exam, and we would get our assessment and our plan, and . . . that's how it started and that's how it went.

Patterson elicited the following additional details:

> DET. PATTERSON: Okay. So Yvonne [Rodriguez] would be in with a patient doing the exam, blood pressure, heart. What else is there?

7

DR. FERRARO: Well, the history, the physical exams, get the vital signs, temperature, pulse, blood pressure, and then look in their ears, check their throat, listen to their lungs. You know if they had issues with their legs, check their legs. And then write down for the physical findings, what the physical findings are.

And what GED[3] – assessment is what you think the patient has. Asthma. You know. Uncontrolled blood pressure. And then what the plan would be. You know, (indiscernible) treatment, blood pressure medicine, get some blood work, send her to pulmonary, you know, so you have . . . the whole thing from the beginning to the end.

DET. PATTERSON: Yvonne did that?

DR. FERRARO: Right.

Regarding prescriptions, Dr. Ferraro said, "I would give [Rodriguez] some signed prescriptions and then she would check with me if it was appropriate for that amount." And, regarding how Rodriguez identified herself, Dr. Ferraro said, "She usually called herself Dr. Rodriguez, Dr. Yvonne." Also, the staff referred to her as "Dr. Rodriguez." Dr. Ferraro agreed that the patients thought Rodriguez was their doctor. Rodriguez usually wore a lab coat with a stethoscope.

Dr. Ferraro knew Rodriguez was not a licensed medical doctor in the United States. Still, when speaking with patients, Dr. Ferraro would refer to

---

[3] The record does not define this acronym.

A-4361-19

Rodriguez as "Dr. Rodriguez or Dr. Yvonne." Although Dr. Ferraro said "most of the time" she would come into the room to go over Rodriguez's impressions of the patient with the patient present, Dr. Ferraro acknowledged there were times when she did not do that, and instead submitted billing orders based solely on Rodriguez's exam and impressions.

Rodriguez told the grand jury that her effort to secure a license was stymied by her failure to obtain a residency. Instead, she worked as a medical assistant, first at St. Joseph's Hospital, and then for Ferraro. Rodriguez was registered with the American Registry of Medical Assistants, but had recently discovered her registration had lapsed.

Rodriguez denied that other staff members called her "Dr. Rodriguez." She agreed the patients called her that, but maintained she always corrected them and reminded them Dr. Ferraro was their physician. Rodriguez denied any knowledge of billing practices, including Galvan's role. Rodriguez admitted she interviewed patients; provided health care information to patients; touched patients; took blood pressure; and wrote in patient files (without signing her name). But she denied diagnosing patients or representing herself as a physician. She said she used the term "my patients" in her Facebook because "anybody at the office considers their patients their patients. Not as their doctor, just as anybody you would help to take care of."

9

She defended her garb in the Facebook photo by stating she sometimes wore a white coat at work, and she used a stethoscope when taking a patient's blood pressure.

Menendez described how his "audit" of a random sample of 100 patients' files led him to conclude that Dr. Ferraro's office received over $150,000 in payments for services that Rodriguez performed, but which the office billed in Ferraro's name. By analyzing the files' handwritten notes, Menendez concluded that two individuals conducted office visits and treated patients (although he also said "multiple people in the office . . . were seeing patients and treating patients"). Menendez found three patients who said they only saw Rodriguez at Dr. Ferraro's practice, and they identified Rodriguez "as Dr. Rodriguez, and stated that she was their doctor." One patient told Menendez that Rodriguez treated her when Dr. Ferraro was not physically present in the office. By examining patient notes, Menendez claimed to be able to distinguish between Rodriguez's and Ferraro's handwriting. Using handwriting style as a guide, he concluded that Rodriguez wrote the notes, and therefore, treated, forty-five of the one hundred patients. He then assumed that forty-five percent of all Horizon's payments to Dr. Ferraro's office between January 2012 and May 2017 — $153,776 — were for services that Rodriguez performed. Menendez called that an "overpayment."

Menendez also opined about the allowable scope of practice of medical assistants. As a former investigator with the New Jersey Division of Consumer Affairs before working with Horizon, Menendez said he was familiar with the structure of the medical profession in New Jersey. Menendez said medical assistants "are permitted to administer certain injections which could be billable under the doctor," but not allergy shots; and medical assistants could not render any diagnoses or perform physical examinations. He said that Rodriguez's notes were the type he would expect a medical doctor to write, such as history of present illness, chief complaint, and "listing of different systems that were checked, such as the lungs, heart, head, eyes, ears, nose and throat, extremities, [and] abdomen."

In the prosecutor's instructions to the grand jury on the practicing-medicine-without-a-license charge, the prosecutor did not attempt to define what the practice of medicine entailed, or what a medical assistant may or may not do under the law. He referred instead to Menendez's testimony on the subject.

The prosecutor also referred to evidence that was not presented to the grand jury, in explaining that a non-practitioner commits health care claims fraud in the second-degree if the person commits five or more acts of health

11

care claims and the benefit obtained or sought was at least $1000. The prosecutor told the grand jurors:

> So we heard the testimony in the case that the claims were submitted. Dr. . . . Ferraro submitted the claims. It was under her provider number, but it was services that, some of the services were rendered by Yvonne Rodriguez, and the insurance company didn't know that, and this involves more than five claims, regardless of what your deliberation is there's no doubt that it's more than five claims, 'cause there's thousands of claims, and that the aggregate amount was over a — at least a thousand dollars.
>
> [(Emphasis added).]

The grand jury returned a six-count indictment. It charged Rodriguez with second-degree health care claims fraud by a non-practitioner, N.J.S.A. 2C:21-4.3 (count one); second-degree theft by deception, N.J.S.A. 2C:20-4(a), (b) (count two); and third-degree practicing medicine without a license, N.J.S.A. 2C:21-20(a) ("engages in that practice") or (c) ("holds himself [or herself] out to the public or any person as being eligible to engage in that practice") (count three). The indictment charged Dr. Ferraro with second-degree health care claims fraud by a practitioner, N.J.S.A. 2C:21-4.3 (count four); and second-degree theft by deception, N.J.S.A. 2C:20-4(a), (b) (count five). And, the indictment charged all defendants with second-degree conspiracy to commit health care claims fraud, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:21-4.3 (count six).

All defendants moved to dismiss the indictment. Dr. Ferraro's counsel took the laboring oar in argument. He challenged the sufficiency of evidence presented. He contended the State's failure to include specific dates when Rodriguez allegedly treated patients denied defendants fair notice and the ability to defend. He also challenged Menendez's methodology for calculating the allegedly fraudulent claims. Counsel minimized the probative value of Rodriguez's Facebook posting. He also argued the grand jury process was flawed because the State failed to present a licensed physician to differentiate between the allowable scope of practice of a physician and of a medical assistant. Rodriguez's counsel noted that she was on maternity leave for an extended period of time, which could call into question the soundness of Menendez's handwriting analysis and overpayment calculation for services allegedly performed by Rodriguez. The State evidently was not aware of her four-month absence.

The prosecutor argued that the evidence was sufficient to support the counts; and the State was not obliged to provide dates and names. He asserted that Rodriguez, as someone who did not hold any license, "shouldn't be treating patients and she shouldn't be writing in . . . files." He suggested that "documenting the services rendered" constituted "practicing medicine." He also asserted that Dr. Ferraro could not delegate patient-related tasks to

13

Rodriguez. "Even if [Dr.] Ferraro was there, she can't direct Rodriguez to do something with these patients, because she's not . . . a licensed member of a profession that can operate under the direction of a physician." The prosecutor also highlighted that Dr. Ferraro "signed prescriptions in blank for Rodriguez."

The prosecutor stated that defendants were free to present an expert to dispute Menendez's methodology, but had not done so (prompting Galvan's defense counsel to respond the State bore the burden to show Menendez's methods were valid; it was not the defense's burden to show they were not). The prosecutor admitted that the State did not review or seize patient files; and interviewed patients could not recall the dates of service. He argued that Galvan and Rodriguez obtained a benefit from the health care claims fraud and theft by deception by receiving their salaries.

In dismissing the indictment, the trial judge identified three flaws in the grand jury process. First, the prosecutor improperly referred to evidence that was not presented to the grand jury by referring to "thousands of claims" of health care claims fraud.

Second, the evidence the State did present was insufficient. The court noted that Menendez's analysis was too speculative, because it consisted of "inferences drawn from unfounded inferences leading to a further inference." There was no proof Rodriguez or Galvan obtained a financial benefit. And

14

there was inadequate evidence regarding the scope of practice of a medical assistant.

Third, the indictment lacked sufficient specificity regarding dates of treatment and the names of patients to provide defendants notice and a fair opportunity to defend.

The court specifically relied on the first point in dismissing count one, charging Rodriguez with second-degree health care claims fraud by a non-practitioner. The prosecutor's statement to the grand jury referred to a key element of the crime: that the person "knowingly commit[] five or more acts of health care claims fraud and the aggregate pecuniary benefit obtained or sought to be obtained is at least $1,000." N.J.S.A. 2C:21-4.3(c). The court held that, by referring to "thousands of claims," the prosecutor "inappropriately impinged upon the independent function of the grand jury to deliberate, weigh the evidence, and determine whether or not there was prima facie evidence of the crime alleged." "For that reason alone," the court dismissed count one, charging Rodriguez with second-degree health care claims fraud by a non-practitioner.

The court dismissed the theft-by-deception count against Rodriguez because "there was no evidence to show that . . . Rodriguez purposely obtained the property of another." The court disagreed with the State's argument to the

15

grand jury that Rodriguez's benefit came in the form of her salary; the court noted there was no testimony that Rodriguez's "salary in any manner whatsoever was conditioned upon" Rodriguez submitting claims.

The court dismissed the practicing-medicine-without-a-license count against Rodriguez for multiple reasons: "there was no evidence presented to the grand jury by any witness or documentation as to what legally permissible duties and responsibilities were of a medical assistant"; Menendez's limited testimony on the subject was inadequate; the State should have identified the patients and dates when Rodriguez allegedly practiced medicine without a license; and the Facebook post and some patients' reference to Rodriguez as "Dr." was insufficient to prove she held herself out as a licensed physician.

In dismissing the health-care-claims-fraud and theft-by-deception charges (counts four and five) against Dr. Ferraro, the court specifically relied on the prosecutor's comment that he was aware of "thousands" of instances of fraud. The judge held that "clearly infringed upon the grand jury's decision-making function."

Regarding the conspiracy charge against all defendants, the court first noted the indictment did not specify whether the parties allegedly conspired to commit health care claims fraud by a practitioner, N.J.S.A. 2C:21-4.3(a), or a non-practitioner, N.J.S.A. 2C:21-4.3(c). The judge concluded, as a legal

matter, that Galvan and Rodriguez could not conspire to violate the former. Furthermore, the court concluded that the reference to "thousands" of claims tainted the sixth count and required dismissal; and there was "no evidence to demonstrate[] that defendant Galvan . . . knowingly engaged in committing healthcare claims fraud."

The State appeals, challenging the dismissal of each count of the indictment. The State argues:

> POINT I
>
> BECAUSE THE STATE PRESENTED AMPLE EVIDENCE TO SUPPORT EACH COUNT OF THE INDICTMENT, THE JUDGE BELOW IMPROPERLY GRANTED DEFENDANT[]S['] MOTION TO DISMISS.
>
> POINT II
>
> THE COURT BELOW ABUSED ITS DISCRETION BY DISMISSING COUNT ONE BASED ON [THE] PROSECUTOR'S CHANCE REMARK WHICH DID NOT INVADE THE GRAND JURY'S INDEPENDENCE.
>
> POINT III
>
> THE COURT COMMITTED PLAIN ERROR BY CONFUSING THE GRADING REQUIREMENTS FOR A PRACTITIONER (DEFENDANT FERRARO) WITH A NON-PRACTITIONER (DEFENDANT RODRIGUEZ) IN DISMISSING COUNT FOUR OF THE INDICTMENT.

17

POINT IV

THE COURT BELOW ABUSED ITS DISCRETION
BY MISCHARACTERIZING TESTIMONY OF
[THE] STATE'S WITNESS MEN[EN]DEZ,
IMPERMISSIBLY IMPOSED A REQUIREMENT
FOR EXPERT TESTIMONY, AND ERRED IN
DISMISSING COUNT SIX.

POINT V

THE COURT BELOW REFUSED TO GIVE THE
STATE THE BENEFIT OF EVERY INFERENCE
AND IMPROPERLY SUBSTITUTED ITS OWN
OPINION AS TO HOW THE CASE SHOULD HAVE
BEEN PRESENTED.

POINT VI

THE COURT BELOW ABUSED ITS DISCRETION
BY THE BASELESS DISMISSAL OF COUNT FIVE
OF THE INDICTMENT CHARGING DEFENDANT
FERRARO WITH THEFT BY DECEPTION.

POINT VII

THE COURT BELOW ERRED IN DISMISSING
COUNT SIX: CONSPIRACY TO COMMIT
HEALTHCARE CLAIMS FRAUD.

Dr. Ferraro and Galvan cross-appeal, arguing the trial court erred by not

dismissing the indictment with prejudice.

A-4361-19

II.

A.

The grand jury fulfills a dual role under our Constitution: to decide if there is probable cause that a crime was committed, and to protect the innocent against unfounded charges. State v. Shaw, 241 N.J. 223, 235 (2020); State v. Bell, 241 N.J. 552, 560 (2020). Though the grand jury is an arm of the court, we reluctantly and sparingly review the grand jury's actions to protect its independence. Shaw, 241 N.J. at 229-30, 239. A court may intervene "only on the clearest and plainest ground, and only when the indictment is manifestly deficient or palpably defective." Bell, 241 N.J. at 560 (quoting State v. Twiggs, 233 N.J. 513, 531-32 (2018)).

However, the court will act "when necessary to ensure the fairness and integrity of grand jury proceedings." Shaw, 241 N.J. at 230. That need to intervene may arise when the evidence presented to the grand jury is insufficient to support the charge. The threshold for judicial interference on that ground is high, because the factual threshold for indictment is low. "A trial court . . . should not disturb an indictment if there is some evidence establishing each element of the crime to make out a prima facie case." State v. Morrison, 188 N.J. 2, 12 (2006).

A court may also intervene in the case of "prosecutorial misconduct." Bell, 241 N.J. at 560-61. However, not any prosecutorial misstep will do. It must be so extreme that it "clearly infringes" on the grand jury's "decision-making function," id. at 560 (quoting State v. Murphy, 110 N.J. 20, 35 (1988)), or it "impinge[s] on a grand jury's independence," id. at 561 (alteration in original) (quoting State v. Francis, 191 N.J. 571, 587 (2007)). That may occur when a prosecutor incorrectly or misleadingly states the law. Ibid. Or it may occur when the prosecutor fails entirely to instruct the grand jury on an essential element of the offense, State v. Majewski, 450 N.J. Super. 353, 366 (App. Div. 2017), or fails to explicate an element of the offense, where failing to do so would "leave purely legal issues open to speculation by lay people" on the grand jury, State v. Brady, 452 N.J. Super. 143, 166 (App. Div. 2017).

A court may also act if the indictment does not clearly and in sufficient detail "apprise a defendant of 'that against which he must defend.'" State v. Lisa, 391 N.J. Super. 556, 578 (App. Div. 2007) (quoting State v. Spano, 128 N.J. Super. 90, 92 (App. Div. 1973), aff'd, 64 N.J. 566 (1974)), aff'd, 194 N.J. 409 (2008). After all, "[t]he primary purpose of an indictment is to inform the defendant of the nature of the offense charged against him so he may adequately prepare his defense and at the same time protect himself against another indictment for the same offense." State v. Rios, 17 N.J. 572, 603

20

(1955). An indictment may not be so general that a petit jury could find a defendant guilty of an offense the grand jury did not charge. State v. Boratto, 80 N.J. 506, 519 (1979).

We review the appeal of the dismissal of an indictment for an abuse of discretion. Bell, 241 N.J. at 561; Morrison 188 N.J. at 5. "[T]he trial court's 'decision should be reversed on appeal only [if] it clearly appears that the exercise of discretion was mistaken.'" Bell, 241 N.J. at 561 (quoting State v. Abbati, 99 N.J. 418, 436 (1985)). We may also affirm the dismissal on grounds other than those the trial court adopted. Brady, 452 N.J. Super. at 165; State v. Shaw, 455 N.J. Super. 471, 481 (App. Div. 2018), aff'd, 241 N.J. 223 (2020). But "[w]hen the decision to dismiss relies on a purely legal question . . . we review that determination de novo." Twiggs, 233 N.J. at 532.

## B.

Applying these principles, we conclude that the most significant defect in the grand jury process was the prosecutor's failure to adequately and accurately instruct the jury about what a medical assistant, as an unlicensed medical professional, may do, and what activities encroach upon the licensed practice of medicine. The prosecutor's failure tainted the grand jury's decision to indict Rodriguez for the unlicensed-practice-of-medicine by "engag[ing] in

21

that practice." N.J.S.A. 2C:21-20(a).[4] But because the grand jury indicted Rodriguez in a single count for "engag[ing] in that practice," N.J.S.A. 2C:21-20(a) or "hold[ing] h[er]self out . . . as being eligible to engage in that practice," N.J.S.A. 2C:21-20(c), the entire count must fail — there is no knowing if the grand jury would have indicted solely on the "holding out" charge. The prosecutor's failure to instruct on the scope of practice also tainted the remaining counts, which depended on a finding that Dr. Ferraro's practice falsely billed for services that only she was licensed to perform, but which Rodriguez performed instead.

Other allied medical professionals, such as advanced practice nurses and physician assistants, are permitted to engage in activities that obviously also fall within the practice of medicine. See, e.g., N.J.S.A. 45:11-49(a)

---

[4] N.J.S.A. 2C:21-20, in relevant part, states a person commits a third-degree crime if he or she:

> [K]nowingly does not possess a license or permit to practice medicine and surgery or podiatric medicine, or knowingly has had the license or permit suspended, revoked or otherwise limited by an order entered by the State Board of Medical Examiners, and he [or she]:
>
> a. engages in that practice;
>
>     . . . .
>
> c. holds himself [or herself] out to the public or any person as being eligible to engage in that practice.

22

(permitting an advanced practice nurse to "initiat[e] laboratory and other diagnostic tests," "prescrib[e] or order[] medications and devices" as authorized and to "prescrib[e] or order[] treatments"); N.J.S.A. 45:9-27.16(b)(2), (4) (allowing a physician's assistant to give injections and write prescriptions, as delegated by a licensed physician); N.J.S.A. 45:9-27.16(a)(2) (permitting a physician's assistant to suture a wound). See also In re Promulgation of N.J.A.C. 13:35-6.14, 205 N.J. Super. 492, 495 (App. Div. 1985) (noting that "the practice of physical therapy . . . overlaps with some aspects of the practice of medicine"). Yet, doing so does not constitute the crime of unlicensed practice of medicine. We held in State v. Campione, 462 N.J. Super. 466, 496 (App. Div. 2020), that even when a licensed physician's assistant violated the Physician's Assistant Licensing Act by engaging in activities without required supervision — specifically, prescribing controlled dangerous substances, N.J.S.A. 45:9-27.19(a) — the physician's assistant could be sanctioned administratively, but not prosecuted for the crime of unlicensed practice of medicine.

The complicating factor in this case is that no New Jersey statute establishes a licensing scheme for medical assistants. Nor has the Board of Medical Examiners comprehensively delineated in its regulations the allowable scope of medical assistants' activities.

Yet, the Board has recognized the role of medical assistants by authorizing "certified medical assistants" to administer "subcutaneous and intramuscular injections and performance of venipuncture," but not allergy injections. N.J.A.C. 13:35-6.4; see also Div. of Consumer Affairs, Administrative Order No. 2021-06 and Waiver No. 2021-02, COVID Immunization Administration by Certified Medical Assistants (last visited July 29, 2021) (permitting certified medical assistants to administer COVID-19 vaccinations notwithstanding that N.J.A.C. 13:35-6.4(d) states that medical assistants may not administer an experimental drug that lacks Food and Drug Administration approval) (available at https://www.njconsumeraffairs. gov/COVID19/Documents/DCA-AO-2021-06_DCA-W-2021-02.PDF). A "certified medical assistant" is defined as someone who has satisfied the educational and training requirements in the regulation, and maintains a current certification from one of several listed non-governmental certifying bodies, although the list is non-exhaustive. N.J.A.C. 13:35-6.4(a)(2). The "certified medical assistant" who administers injections must also "wear a clearly visible identification badge indicating his or her name and credentials." N.J.A.C. 13:35-6.4(c)(5).

The Board has also permitted physicians to delegate to "an unlicensed assistant" "the administration of an appropriate physical modality" — such as

24

heat, cold and whirlpool baths — provided various conditions are satisfied. N.J.A.C. 13:35-6.14.[5] For example, the physician must direct the assistant; the physician must see the patient before the modality is performed; and the physician must remain on the premises when it is performed.  Ibid.

At the very least, then, a medical assistant, if certified, may administer certain injections without committing the crime of practicing medicine without a license.  And an unlicensed assistant — presumably including medical assistants — may perform certain physical modalities in a physician's office, although that "might be considered as constituting the practice of medicine, falling within the broad definition of 'any method of treatment of human ailment, disease, pain, injury, deformity mental or physical condition.'"  In re Promulgation of N.J.A.C. 13:35-6.14, 205 N.J. Super. at 498 (quoting N.J.S.A. 45:9-5.1).  However, the Board possessed the authority under its general rule-making authority, N.J.S.A. 45:9-2, to permit unlicensed assistants to perform those functions.  Ibid.  And the Board expressly stated that unlicensed employees performing modalities were "not deemed by the Board to be the practice of medicine."  Id. at 497 (quoting 17 N.J.R. 837(a) (Apr. 1, 1985)).

---

[5]  In an earlier version of the regulation, assistants were also permitted to administer "ultrasound, ultraviolet rays, cold quartz rays and electro-magnetic rays."  17 N.J.R. 837(a) (Apr. 1, 1985) (codified at N.J.A.C. 13:35-6.14(b) (1985)).  The Legislature then passed a law prohibiting physicians from delegating such tasks to employees who were not licensed health care providers.  L. 1990, c. 68 (codified at N.J.S.A. 45:9-22.10).

A-4361-19

Evidently, the Board has not formally outlined the other allowable activities of unlicensed medical assistants, whether certified or not. That contrasts with regulatory bodies in other states. For example, New York regulators, though stating that a "medical assistant" (whether certified or not), is not a licensed or recognized title, have stated that a licensed physician may delegate to unlicensed medical assistants certain tasks that do not "require the exercise of medical judgment and assessment," or that are not "specifically restricted to licensed professionals." <u>Utilization of Medical Assistants</u>, New York State Education Department (Dec. 2019), http://www.op.nysed.gov/prof/med/medmedicalassistants.htm. Permitted tasks include:

- Secretarial work such as assembling charts or assisting with billing
- Measuring vital signs
- Performing ECGs [electro-cardiograms]
- Assisting an authorized practitioner, under the direct and personal supervision of said practitioner, to carry out a specific task that does not require medical judgment or decision making
- Removing sutures or staples under the supervision of a physician or other appropriately licensed person, provide[d] that the patient is evaluated, at a minimum, immediately before the procedure by an appropriately licensed professional
- Act[ing] as [a] scribe and enter[ing] History and Physical information, chief complaint, medications, allergies, and family history into a chart or Electronic Medical Record and assisting patient in filling out self-report questionnaire

26

- Collecting and preparing [certain specified] laboratory specimens and transcribing results without interpreting or assessing [them]
- Performing basic hearing and vision tests
- Providing prepared family education and instruction
- Changing or applying wound dressings (not casts)
- Applying [an] allergen patch test but not interpreting it

[Ibid.]

Other state laws expressly address the role of unlicensed medical assistants. See, e.g., Cal. Bus. & Prof. Code §§ 2069-2071 (Deering 2021); Cal. Code Regs. tit. 16, § 1366.3(c) (2021) (defining "qualified medical assistant").[6]

---

[6] Despite their unlicensed status, medical assistants evidently have become an important part of the staff in physicians' offices and other settings. According to the United States Bureau of Labor Statistics, roughly 725,000 medical assistants were employed in the United States in 2019, Occupational Outlook Handbook, U.S. Bureau of Labor Statistics, https://www.bls.gov/ooh/healthcare/medical-assistants.htm (last visited July 29, 2021) [hereinafter "Handbook"]; and over 17,000 in New Jersey in 2020, May 2020 State Occupational Employment and Wage Estimates – New Jersey, U.S. Bureau of Labor Statistics, https://www.bls.gov/oes/current/oesnj.htm#29-0000 (last visited July 29, 2021). Consistent with New York's regulatory advice, the Handbook states that medical assistants typically "[r]ecord patient history and personal information[;] [m]easure vital signs, such as blood pressure[;] [h]elp physicians with patient examinations[;] [g]ive patients injections or medications as directed by physicians and as permitted by state law[;] [s]chedule patient appointments[;] [p]repare blood samples for laboratory tests[; and] [e]nter patient information into medical records." See also Thomas Bodenheimer et. al, Expanding the Roles of Medical Assistants, Who Does What in Primary Care?, JAMA Internal Med. 174(7) (July 2014), (noting that "emerging roles" of medical assistants, who are "not licensed but work under the license of a physician," include "health coaching, and team documentation (also called clinical scribing)"); Susan A. Chapman and Lisel K. Blash, New

27

New Jersey regulators have not charted the boundaries of a physician's authority to delegate tasks to an unlicensed medical assistant. However, we are persuaded that a physician has authority, inherent in his or her license, to delegate certain "ministerial tasks" to medical assistants, and other unlicensed staff. See 16 N.J.R. 2065(a) (Aug. 6, 1984) (the Board of Medical Examiners, in its rule proposal, referring to "the ministerial task of applying certain modalities, after a medical judgment has been made" they were indicated). But a physician may not delegate tasks that require the exercise of medical judgment and assessment (although that may be easier to say than to implement) or that encroach on tasks specifically assigned to other licensed professionals. What specific tasks a physician may delegate should best be defined by the Legislature and the expert regulators of the profession. "Indeed, we have recognized that the [Board of Medical Examiners] has been delegated the authority to draw a line 'between services which nonprofessionals could perform and those which must be limited to licensed health care providers.'" N.J. State Ass'n of Nurse Anesthetists, Inc. v. N.J. State Bd. of Med. Exam'rs, 372 N.J. Super. 554, 562 (App. Div. 2004)

---

Roles for Medical Assistants in Innovative Primary Care Practices, Health Serv. Res. 52:1, Part II: 383-406 (Feb. 2017) (studying the role of medical assistants at fifteen sites across the country, including one in New Jersey).

(quoting In re Promulgation of N.J.A.C. 13:35-6.14, 205 N.J. Super. at 498), aff'd, 183 N.J. 605 (2005).

However, the failure of the Legislature or regulators to draw a clear line marking the full scope of a medical assistant's allowable activities raises a significant hurdle to prosecuting someone for crossing the line.[7] "Persons must receive fair warning that certain behavior is criminal." State v. Riley, 412 N.J. Super. 162, 183 (Law Div. 2009). As Justice Holmes stated long ago, "Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." McBoyle v. United States, 283 U.S. 25, 27 (1931).

The "fair warning" requirement is manifest in the rule of lenity, the void-for-vagueness doctrine, and the due process bar to prosecuting someone for conduct that "neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." United States v. Lanier, 520 U.S. 259, 266

---

[7] We do not comment on the impact of this lack of clarity on the Board of Medical Examiners' civil authority to revoke the license of a physician who "[h]as permitted an unlicensed person or entity to perform an act for which a license . . . is required." N.J.S.A. 45:1-21(n). See State v. Afanador, 134 N.J. 162, 170 (1993) (stating "courts give criminal laws sharper scrutiny and more exacting and critical assessment under the vagueness doctrine than they give to civil enactments").

(1997). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267.

We recognize that, despite this gray area of the law, there are some things that are black or white. For example, we assume it "reasonably clear" that medical assistants may not prescribe medicine or diagnose illness (as opposed to other health care professionals who are licensed and specifically authorized to do so). Cf. N.J.S.A. 45:9-18 (stating, for purposes of N.J.S.A. 45:9, that a person "shall be regarded as practicing medicine and surgery" if the person undertakes "to diagnose . . . or prescribe for any human disease, pain, injury, deformity or physical condition").[8]

---

[8] By citing N.J.S.A. 45:9-18, we do not imply that civil law necessarily provides fair warning of the criminal law's meaning. See, e.g., Lisa, 194 N.J. at 411 (holding that "sufficient notice of potential criminal liability [for manslaughter] cannot 'be found in emanations from a scholarly treatise [the Restatement (Second) of Torts] that has never made its way into New Jersey substantive criminal law'") (quoting Lisa, 391 N.J. Super. at 579); State v. Thompson, 402 N.J. Super. 177, 201-05 (App. Div. 2008) (holding that civil Conflict of Interest Law did "not provide sufficient notice that the unreasonable appearance of impropriety may lead to a defendant's conviction of a crime" of official misconduct). Rather, deeming a person who diagnoses disease or prescribes medication as someone who practices medicine as set forth in N.J.S.A. 45:9-18 comports with "ordinary and well-understood meaning[]" and, "[a]bsent any explicit indications of special meanings," it defines with reasonable clarity what it means for a person, not otherwise licensed, to engage in the practice of medicine under N.J.S.A. 2C:21-20(a). See Afanador, 134 N.J. at 171 (rejecting vagueness challenge, stating that "[a]bsent any explicit indications of special meanings, the words used in a

However, the prosecutor did not instruct the grand jury to limit itself to such clear encroachments into the practice of medicine. Instead, the prosecutor relied upon the testimony of a witness, Horizon Blue Cross/Blue Shield's fraud investigator. There were two problems with that.

First, the prosecutor — not a witness (especially one not offered as an expert in the law) — is the grand jury's legal advisor. See Brady, 452 N.J. Super. at 166 (stating "in the first instance, the prosecutor must clearly and accurately explain the law to the grand jurors"). The prosecutor may not abdicate that role.

Second, Menendez's testimony fell short of identifying "reasonably clear" areas of authorized and unauthorized practice of medical assistants. Menendez stated that medical assistants may not perform examinations (yet, medical assistants arguably may be utilized to take blood pressure, take vitals, or administer an ECG), and Menendez stated that Rodriguez's notes covered items he would expect a physician to address — such as the history of present

statute carry their ordinary and well-understood meanings"). We cannot say the same, for example, about the statement in N.J.S.A. 45:9-5.1 that, for purposes of N.J.S.A. 45:9, the "'practice of medicine and surgery'" also includes "any method of treatment of human ailment, disease, pain, injury, deformity, mental or physical condition." It is not "reasonably clear" that performing "any method of treatment" constitutes a crime as applied to medical assistants, because the Board has expressly permitted persons not otherwise licensed to perform some treatments, and we infer that unlicensed persons may perform others at a physician's direction.

illness, and chief complaint and different systems that were checked (yet, evidently, medical assistants may inquire about a patient's information, history and complaints, and record the readings and answers).

Even assuming that certain functions unquestionably fall outside the scope of a medical assistant's allowable activities, such as diagnosing illness or prescribing medication — and there was some evidence that Rodriguez evaluated patients and filled out scrips — the grand jury was led to believe that Rodriguez encroached on the practice of medicine by doing much more: interviewing patients, eliciting their histories and complaints, taking vital signs, providing information to patients, and writing in charts. "[I]t [is] 'no answer to say that the evidence before the grand jury was sufficient to support an indictment on some other theory.'" Lisa, 194 N.J. at 411-12 (quoting Lisa, 391 N.J. Super. at 581). We have no confidence that the grand jury would have indicted Rodriguez under N.J.S.A. 2C:21-20(a) — "engag[ing] in that practice" — had it been properly instructed. To sustain the indictment nonetheless would rob the grand jury of its "screening function." See Shaw, 241 N.J. at 243. In sum, the absence of clear and adequate instructions tainted the grand jury's decision to indict Rodriguez for engaging in the practice of medicine by an unlicensed person under N.J.S.A. 2C:21-20(a).

We recognize that the absence of instructions did not directly impact the charge that Rodriguez held herself "out to the public or any person as being eligible to engage" in the practice of medicine under N.J.S.A. 2C:21-20(c). And there was "some evidence" upon which the grand jury could rely in charging an offense under subsection (c) — including the evidence of Rodriguez's Facebook post depicting her clad in a lab coat and stethoscope and referring to her "patients," and the statements from a patient and Dr. Ferraro that she used the "Dr." title, notwithstanding her explanations to the contrary. See Campione, 462 N.J. Super. at 497 (stating that, to survive a motion to dismiss an indictment, it was enough for the State to produce "some evidence" that physician's assistant "presented himself as a physician to . . . patients by referring to himself as a medical doctor"); cf. N.J.S.A. 45:9-18 (stating, for purposes of N.J.S.A. 45:9, that a "person shall be regarded as practicing medicine" if the persons uses "'Dr.' . . . and who, in connection with such title . . . holds h[er]self out as being able to diagnose, treat, operate or prescribe").

However, the grand jury did not indict Rodriguez in a separate count under subsection (c). Rather, the grand jury indicted Rodriguez in a single count, alleging she "did engage in that practice [of medicine] or did hold herself out to the public or any person as being eligible to engage in that practice." (Emphasis added). But "separate and distinct offenses cannot be

33

charged in the same count of an indictment." State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 21 (1984).

The two offenses charged under N.J.S.A. 2C:21-20 are "separate and distinct" because they have different elements and require different proofs. See State v. Krieger, 285 N.J. Super. 146, 153 (App. Div. 1995) (finding duplicitous a single indictment count charging violation of N.J.S.A. 2C:29-3(a) or 3(b), which were "[a]lternative crimes with disparate elements"). When two distinct offenses are charged in a single count, "there is no way of knowing" if a petit jury returning a general verdict was unanimous as to both offenses. Trade Waste, 96 N.J. at 21 (quoting United States v. Starks, 515 F.2d 112, 116-17 (3d Cir. 1975)). Likewise, by charging Rodriguez in the disjunctive, it is unclear whether a requisite number of grand jurors agreed to indict under subsection (c) alone.[9] See R. 3:6-9(a) (requiring concurrence of twelve or

---

[9] We acknowledge that the Supreme Court has also "allowed counts [in an indictment] to embrace more than one issue when the statute in question addresses several things disjunctively." State v. McDougald, 120 N.J. 523, 563 (1990) (citing State v. Pirone, 78 N.J. Super. 158, 160-61 (App. Div. 1963)). But, the charges in those cases have involved the same conduct. In Pirone, we upheld an indictment that joined in a single count "wilful and malicious burning, and setting fire with intent to burn" because "both crimes relate[d] to the same fire." 78 N.J. Super. at 160. Likewise, in McDougald, the defendant was charged with hindering apprehension by violating N.J.S.A. 2C:29-3(b)(2) or (3), by the same act of killing two witnesses. Here, the two forms of unlicensed practice of medicine involve different acts. Furthermore, because we cannot determine if the grand jury agreed to indict under N.J.S.A.

more grand jurors). Therefore, we affirm the dismissal of count three of the indictment in its entirety.

The failure to clearly instruct the grand jury as to the appropriate scope of a medical assistant's practice also tainted the counts charging theft by deception, health care claims fraud, and conspiracy to commit health care claims fraud. The crux of the deception and the fraud was that Dr. Ferraro sought reimbursement for procedures and activities that Rodriguez performed, by falsely conveying Dr. Ferraro performed them instead. Menendez stated that only licensed health care professionals had identification numbers to bill insurers for services. Thus, any procedure or activities a medical assistant performed would have to be billed under the supervising physician's number. It was essential for the grand jury to know what procedures or activities a medical assistant could lawfully undertake in order to fairly decide whether Rodriguez, Dr. Ferraro, or Galvan intended to deceive or defraud Horizon.

C.

The trial court appropriately identified additional grounds for dismissing the theft-by-deception, health-care-claims-fraud, and conspiracy counts. The prosecutor's statement that the alleged health-care-claims-fraud "involve[d] more than five claims . . . 'cause there's thousands of claims" expressed the

---

2C:21-20(a) or (c), we would usurp the grand jury's role if we struck one of the crimes and reinstated the other. Cf. Pirone, 78 N.J. Super. at 160.

A-4361-19

prosecutor's view on the quantity and quality of evidence, and conveyed to the grand jury that the State had more evidence of criminality than it chose to present. That, the prosecutor may not do. See State v. Eckel, 429 N.J. Super. 580, 591 (Law. Div. 2013) (dismissing indictment because prosecutor commented to the grand jury on the "quantum and quality of the evidence"); see also Sara Sun Beale et al., Grand Jury Law & Practice, § 9:3 (2d ed. 2020) (stating the problem presented by a "prosecutor's statement of his or her personal opinion" "is magnified if the prosecutor's comments suggest that his opinion is based on additional evidence not presented to the grand jury").

That most directly prejudiced Rodriguez, because an element of the health-care-claims-fraud count was proof of five or more claims totaling at least a thousand dollars. See N.J.S.A. 2C:21-4.3(c). But, as the court observed, the prejudice was more far-reaching, because the prosecutor effectively told the grand jury that it did not have to rely on the handful of patients that Menendez or his team interviewed, or even the hundred files that he reviewed, because there were "thousands" of false claims that were never presented to the grand jury. Essentially, the judge concluded that the prosecutor's remark "'substantially influenced the grand jury's decision to indict'" or created "'grave doubt' that the determination ultimately reached was arrived at fairly and impartially." State v. Sivo, 341 N.J. Super. 302, 318

(Law. Div. 2000) (quoting Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988)). We agree.

We also defer to the trial court's critique of Menendez's method of calculating the amount allegedly obtained fraudulently or deceptively. Menendez's calculation was the only evidence satisfying the greater-than-$75,000-element of second-degree theft that Rodriguez and Dr. Ferraro allegedly committed. See N.J.S.A. 2C:20-2(b)(1)(a). Menendez or his team spoke to ten patients who visited Dr. Ferraro's medical clinic. Three patients indicated they saw only Rodriguez. Based on statements taken from those individuals, Menendez concluded the handwriting in the files for those patients belonged to Rodriguez. Despite the State's failure to qualify Menendez to offer a handwriting opinion, Menendez relied on his handwriting analysis and records review to conclude Rodriguez treated patients in forty-five of the one hundred randomly selected files; and then, without any additional justification, Menendez extrapolated that forty-five percent of all Horizon claims involved services Rodriguez performed.[10]

---

[10] This conclusion is further called into question by the disclosure that Rodriguez took about four months of maternity leave when the crimes allegedly occurred. Further, the statements of patients Menendez interviewed indicate that other people, besides Rodriguez and Dr. Ferraro, saw patients. Who they were and what roles they played in the office is unclear.

Although an indictment may be based on hearsay, see State v. Thrunk, 157 N.J. Super. 265, 278 (App. Div. 1978), or on evidence that would not be competent at trial, see State v. Holsten, 223 N.J. Super. 578, 585 (App. Div. 1988), the trial court appropriately exercised its discretion in determining that Menendez's opinion lacked sufficient reliability to support the indictment.  In State v. Vasky, 218 N.J. Super. 487 (App. Div. 1987), as here, the State had to present evidence of value as an element of theft.  We affirmed dismissal of the indictment because "[t]here was no evidence" the persons opining about the stolen items' value "had personal knowledge based on observation of [the items] or had the experience necessary to value them."  Id. at 491-92.  We held, "Statements of fact or opinion that are not even remotely supported by personal knowledge or experience are not evidence and may not be the basis for an indictment."  Id. at 492.

To meet the $75,000 threshold, the State needed to provide more than a speculative extrapolation based on three patients and an unqualified handwriting analysis.  The State was obliged to identify specific patients Rodriguez treated, the fraudulent claims submitted, and the monies paid out as a result of the alleged deception.  The State did none of that.

The trial court also appropriately found that the indictment lacked essential detail.  The prosecutor, conceding that "we didn't indict per patient

. . . [and] per date," explained, "[t]he patients don't know specifically at or about what time they were [treated by the office]." Nor did the State present to the grand jury — or disclose to defendants in discovery — evidence of the specific insurance claims for procedures or services that Rodriguez rather than Dr. Ferraro allegedly performed that encroached on the practice of medicine, the patient involved, and the amount received.

As we have noted, an indictment's "primary purpose" is to enable a defendant to prepare a defense by adequately describing the offense charged. Rios, 17 N.J. at 603. It is fundamental that "an indictment . . . must not only contain all the elements of the offense charged, but must also provide the accused with a sufficient description of the acts [s]he is alleged to have committed to enable h[er] to defend h[er]self adequately." 5 Wayne R. LaFave et al., Criminal Procedure, § 19.3(c) (4th ed. 2020) (quoting United States v. Rizzo, 373 F. Supp. 204, 205-06 (S.D.N.Y. 1973), aff'd sub nom. United States v. Marion, 493 F.2d 1399 (2d Cir. 1974)). "[A]n 'indictment must allege all the essential facts of the crime.'" State v. Dorn, 233 N.J. 81, 93 (2018) (quoting State v. LeFurge, 101 N.J. 404, 418 (1986)); see also United States v. Menendez, 137 F. Supp. 3d 688, 706 (D.N.J. 2015) (noting that "[a] valid indictment may not simply allege the 'essential elements of the offense;' it must also allege specific facts that satisfy those elements" (quoting United

States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007)), aff'd, 831 F.3d 155 (3d Cir. 2016)).

As a general rule, "[t]he charging instrument must include a satisfactory response to the questions of 'who . . ., what, where, and how.'"  5 LaFave § 19.3(c) (quoting People v. Zupancic, 557 P.2d 1195, 1197 (Col. 1976)). Further, it has traditionally been the rule that "time and place have been viewed as not requiring great specificity," as they typically are not elements of the crime; "[t]hus, the time allegation can refer to the event as having occurred 'on or about' a certain date and, within reasonable limits, proof of a date before or after that specified will be sufficient, provided it is within the statute of limitations."  Ibid.

What constitutes fair notice depends on the circumstances.  State in the Interest of K.A.W., 104 N.J. 112, 121-22 (1986).  Among the factors the Court has deemed relevant to determining whether the dates in an indictment provide fair notice of the crimes is "the extent and thoroughness of the prosecutor's investigative efforts to narrow the time frame of the alleged offense."  Id. at 122.  Here, the prosecutor could have reviewed treatment files (as Horizon did) and identified instances in which Rodriguez allegedly performed services that were mislabeled as performed by Dr. Ferraro.  Thus, even if patients could not, unassisted, recall visits in which Rodriguez allegedly treated them as if she

40

were a licensed physician, the patients' treatment records presumably existed, and could have been used to refresh the patients' memories to identify the dates of the alleged crimes. Moreover, the State's failure to obtain patient records from the office does not excuse its inability, on the second presentment, to establish specific dates of criminality.

Under the circumstances, the State's allegation that the crimes occurred "on or about January 2012 until on or about May 2017" failed to apprise defendants of the crimes alleged or to enable them to mount a defense. Absent such detail, Rodriguez, Galvan, and Dr. Ferraro were severely handicapped in their ability to defend. The trial court did not abuse its discretion in dismissing the indictment on the grounds it omitted sufficient detail to enable defendants to defend.

All these flaws in the indictment and the grand jury process also undermine the viability of the conspiracy count. In particular, the record lacks evidence that Galvan in particular entered into a conspiracy to commit health care claims fraud. "[T]he agreement to commit a specific crime is at the heart of a conspiracy charge. Such an agreement is central to the purposes underlying the criminalization of the inchoate offense of conspiracy." State v. Samuels, 189 N.J. 236, 245 (2007).

In sum, we affirm the trial court's order dismissing the indictment.

III.

On Galvan's and Dr. Ferraro's cross-appeals, they contend the trial court should have dismissed the second indictment with prejudice because the indictment was motivated by prosecutorial vindictiveness.

Our Court has recognized that "[p]rosecutorial vindictiveness in the indictment process may . . . run afoul of due process and warrant court intervention." Shaw, 241 N.J. at 240. The due process violation consists of retaliation against a defendant who successfully exercised his or her appellate rights. State v. Gomez, 341 N.J. Super. 560, 571 (App. Div. 2001).

In this case, after the trial court dismissed the first indictment, the prosecutor certainly "upped the ante" by obtaining the grand jury's approval of second-degree charges. See Blackledge v. Perry, 417 U.S. 21, 27-28 (1974) (establishing presumption of vindictiveness when prosecutor discouraged misdemeanor appeal "by 'upping the ante' through a felony indictment whenever a convicted misdemeanant pursues his statutory appellate remedy"). However, "no presumption of vindictiveness arises in the pretrial stage." Gomez, 341 N.J. Super. at 573. That is because "[t]rial preparation or continuing investigation may well lead the prosecutor to the reasonable conclusion that additional or substituted charges are appropriate." Id. at 575.

Therefore, a defendant claiming prosecutorial vindictiveness must present "affirmative proof of actual vindictiveness." Id. at 578. The trial court found no such proof here, and we discern insufficient grounds to disturb that finding. Id. at 577 (stating that we must determine "if sufficient credible evidence in the record as a whole supports" the trial court's prosecutorial vindictiveness finding, although we more broadly review implications the court draws from its findings).

Nor is dismissal with prejudice compelled by Shaw. To protect the grand jury's screening function, the Supreme Court in Shaw established limitations on grand jury resubmissions. 241 N.J. at 243-44. But, the Court's rule applies when a grand jury refuses to indict, and the State persists in seeking an indictment. Ibid. In this case, both grand juries agreed to indict.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION